## REES et al. v. UNITED STATES.

### No. 4296.

Circuit Court of Appeals, Fourth Circuit.

April 5, 1938.

I. Duke Avnet, of Baltimore, Md., William L. Standard, of New York City, and Wilfred T. McQuaid, of Baltimore, Md., for appellants.

T. Barton Harrington, Asst. U. S. Atty., and Bernard J. Flynn, U. S. Atty., both of Baltimore, Md., and Henry A. Schweinhaut, Sp. Asst. to Atty. Gen.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

## NORTHCOTT, Circuit Judge.

The 14 appellants, Walter H. Rees, William Otis Forrest, William A. Raymon, David K. Tuttle, Jr., Earle F. Parsons, Roderick Campbell, Cesar Cortez, Joseph P. Olmo, Felipe Del Valle, Bruno Pietkiewicz, Jhon O. Batista, James E. Whitenton, John. H. Croghan, and William J. Cassidy, here referred to as the defendants, were indicted in 'the District Court of the United States for the District of Maryland, on November 30, 1937, charged with a violation of section 483, Title 18, U.S.C.A., Criminal Code, § 292. There are two counts in the indictment. The first count charged the defendants with endeavoring, on September 10, 1937, to make a revolt on board the steamship Algic, while in the harbor of Montevideo, Uruguay. The second count charged the defendants with conspiring to make said revolt.

The indictment reads as follows:

"The Grand Inquest of the United States of America, in and for the District of Maryland, inquiring for the body of said District, do on their oath present that (naming defendants) each late of said District, who are hereinafter referred to as Defendants, being then and there of the crew of a certain vessel of the United States, to wit, the steamship Algic, heretofore, to wit, on or about the 10th day of September, 1937, on waters within the admiralty and maritime jurisdiction of the United States, and within the jurisdiction of this Court, to wit, the harbor of Montevideo, Uruguay, did unlawfully and feloniously endeavor to make a revolt on board of said vessel; and the said Defendants were thereafter found at Baltimore, in the State and District of Maryland.

"Contrary to the form of the statute in such case made and provided, and against the peace, government and dignity of the United States. U.S.C.A., Title 18, § 483.

"Second Count.

"And the Grand Inquest aforesaid, upon their oath aforesaid, do further present that (naming defendants), each late of said District, who are hereby indicted, and who are hereinafter referred to as Defendants, and Clegg Alexander Lowder, Oscar Thomas Lampkin, Jr., also known as James Oscar Lampkin, Rubel Stewart, also known as Robert Stewart, and Joseph A. Hartley, who are herein mentioned and named as co-conspirators, but who are not herein indicted, all of the said persons being then and there of the crew of a certain vessel of the United States, to wit, the steamship Algic, heretofore, to wit, on or about the 10th day of September, 1937, on waters within the admiralty and maritime jurisdiction of the United States, and within the jurisdiction of this Court, to wit, the harbor of Montevideo, Uruguay, did unlawfully and feloniously combine, conspire, confederate and agree together and with each other to make a revolt on board of said vessel; and the said Defendants were thereafter found at Baltimore, in the State and District of Maryland.

"Contrary to the form of the statute in such case made and provided, and against the peace, government and dignity of the United States. U.S.C.A., Title 18, Section 483."

On December 8, 1937, a demurrer to the indictment was filed on behalf of the defendants. On December 13, 1937, an order was entered by the trial judge overruling the demurrer. Thereupon the defendants, by their attorneys, moved the court to permit a waiver of a jury trial and requested that the case be tried by the court without a jury. The United States by its attorney refused to consent to the waiver of a jury trial and the court denied the defendant's motion to try the case without a jury. The defendants were then arraigned and pleaded not guilty. A trial was had before a jury which returned a verdict finding all the defendants guilty as charged in the indictment.

On December 18, 1937, a motion for a new trial and a motion in arrest of judgment were filed on behalf of the defendants. On December 20, 1937, the trial judge filed a memorandum opinion overruling both motions and entered a judgment sentencing the defendants, Walter H. Rees, William Otis Forrest, William A. Raymon, David K. Tuttle, Jr., Earle F. Parsons, Roderick Campbell, Cesar Cortez, Bruno Pietkiewicz, and James E. Whitenton to 2 months imprisonment in jail, and each of the defendants, Joseph P. Olmo, Felipe Del Valle, Jhon O. Batista, John H. Croghan, and William J. Cassidy, to pay a fine of $50, without cost. From this action this appeal was brought.

The defendants were all unlicensed members of the crew of the steamship Algic, a freight vessel owned by the United States Maritime Commission, an agency of the United States government, being operated for the Commission by the American Republics Line, under a temporary agreement in conformity with section 707(c) of the Merchant Marine Act of 1936, Title 46, U. S.C.A. § 1197(c). On July 16, 1937, at Jacksonville, Fla., shipping articles were signed for a full complement of officers and crew, numbering 38 and including the defendants, for a voyage to South American ports and return, the voyage not to exceed 12 months in duration. The vessel, in command of Captain Joseph A. Gainard, sailed two days later and reached the port of Montevideo, Uruguay, homeward bound, on September 10, 1937, about 6:45 a. m. The Algic anchored in the harbor, using two anchors, about three-quarters of a mile from the dock, between the inner and outer breakwaters. The purpose of her call at Montevideo was to load a miscellaneous cargo, which had to be done from lighters, the work of loading being done by stevedores, who had been arranged for by the local agent of the ship. The only work to be done by the crew of the vessel, with regard to the loading of the cargo, was to furnish steam from the engineering department to give power in the operation of the winches and other machinery used in lifting the freight from the lighters and placing it in the holds of the ship. The crew had no part in the actual handling of the freight, and while cargo is being loaded in port the crew are assigned certain duties, such as painting, cleaning, chipping, etc. These orders for the day beginning at 8 o'clock a. m. were given to the crew by the officers through the boatswain, as was the usual custom.

About 7 o'clock a. m. the stevedores went on board and proceeded to load cargo. Members of the crew learned that a stevedores' strike was in progress in the port and saw a number of natives, presumably striking stevedores, encircling the Algic in launches, shouting and making menacing gestures at the crew and the stevedores on the deck.

Shortly after 8 o'clock a. m. the crew called a meeting, at which all the defendants were present, and after a discussion concluded that the stevedores working on the vessel were strike breakers and decided, by a unanimous vote, to notify the officers of the ship that they would not work with or assist the stevedores on the ship and selected two delegates, defendant Rees, of the deck department, and one Lampkin of the engine department, to notify the officers of their decision. It was also decided at the meeting that the steam would be turned off, if necessary, in order to stop the work of the stevedores.

The two delegates informed the chief officer, the captain being sick in bed, of the refusal of the crew to work with the stevedores. The chief officer told Rees and Lampkin that the strike situation was none of the crew's business, and asked them to go back and explain to the crew the situation as to the strike, there being some information that the strike was not a union and nonunion controversy, but a personal factional fight between groups of the stevedores. Rees and Lampkin returned about 8:35 a. m. and notified the chief officer that the crew still refused to work. The chief officer then talked to the men himself and when he found that the crew was apparently determined to persist in their attitude, he requested Rees and Lampkin to ask the men to leave the steam on long enough so that the hatches could be covered, in order to protect the cargo already loaded. The delegates subsequently reported to him that the men agreed to this and the hatches were covered. Almost immediately thereafter the steam was turned off at the master valve in the engine room, thus putting out of commission all the machinery on the deck. In the meantime the stevedores had ceased to work, but remained on the ship throughout the day.

The American Consul at Montevideo, having been sent for, came aboard the vessel about 9:25 a. m. and, after being advised by the officers as to the situation, talked to the crew advising them that, in his opinion, they were acting without authority of law, and should go back to work. After the Consul withdrew, the crew took another vote and Rees and Lampkin reported to the chief officer that the men still refused to work, the vote being 11 men to keep the steam off, 7 to keep it on, and 4 men not voting. After that the captain of the ship, the agent of the steamship line, and the American Consul went ashore, where the captain communicated by telephone with the Maritime Commission in Washington, about the situation.

During the morning it became necessary to shift the anchorage and one of the

engineers turned the steam on so that could be done. The anchors were changed by the chief officer assisted by the third mate.

About 5 o'clock p. m. the captain and the Consul having returned to the ship, the captain assembled the crew in the presence of the other officers and the Consul, and informed them that he had communicated with the Maritime Commission and had been directed to put such men as refused to obey his lawful orders in irons. Each member of the crew was then asked if he would obey the orders of the captain and work with the stevedores, and they all agreed to do so. The next day the cargo was loaded by the same stevedores who started the work the first day, a delay of 24 hours having been occasioned by the events detailed.

Four main questions are presented on the appeal:

(1) The sufficiency of the indictment.

(2) The right of the defendants to have the case tried by the judge instead of by a jury.

(3) The sufficiency of the evidence to sustain a conviction.

(4) The lawful right of the crew, under the existing circumstances, to strike.

The statute which the defendants were charged with violating is Title 18, U.S.C.A. § 483, Criminal Code, § 292, which reads as follows: "Inciting revolt or mutiny on shipboard. Whoever, being of the crew of a vessel of the United States, on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, endeavors to make a revolt or mutiny on board such vessel, or combines, conspires, or confederates with any other person on board to make such revolt or mutiny, or solicits, incites, or stirs up any other of the crew to disobey or resist the lawful orders of the master or other officer of such vessel, or to refuse or neglect their proper duty on board thereof, or to betray their proper trust, or assembles with others in a tumultuous and mutinous manner, or makes a riot on board thereof, or unlawfully confines the master or other commanding officer thereof, shall be fined not more than $1,000, or imprisoned not more than five years, or both."

As to the first question, the sufficiency of the indictment, it is contended that it is faulty in that it did not inform the accused with particularity and precision of the exact nature of the offense charged against them as is provided in the Sixth Amendment to the Constitution, which reads, in part, as follows: "In all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation."

It is further contended that the indictment merely described the offense charged in generic terms, charging the offense in the general language of the statute, failing to state in what manner the accused endeavored and conspired to make the revolt, and failing to inform them which class of revolt they were charged with endeavoring or conspiring to commit.

Indictments, similar to the one here, charging the offense in the language of the statute, have been before the courts of the United States in a number of cases and have been considered sufficient. Hamilton v. United States, 4 Cir., 268 F. 15; United States v. Almeida, 24 Fed.Cas. p. 775, No. 14,433; United States v. Barker, 24 Fed. Cas. p. 985, No. 14,516; United States v. Seagrist, 27 Fed.Cas. p. 1002, No. 16,245; United States v. Huff, C.C., 13 F. 630; United States v. Kelly, 11 Wheat. 417, 6 L.Ed. 508.

In the case of United States v. Gooding, 25 U.S. 460, 12 Wheat. 460, 474, 6 L.Ed. 693, Mr. Justice Story said: "In general, it may be said, that it is sufficient certainty in an indictment, to allege the offence in the very terms of the statute. * * * And in endeavors to commit a revolt, which is by statute in England made a capital offence, it has always been deemed sufficient, to allege the offence in the words of the statute, without setting forth any particulars of the manner or the means."

The case of United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 573, 31 L.Ed. 516, is strongly relied upon to support the contention that the indictment is insufficient. There the court said: "The doctrine invoked by the solicitor general, that it is sufficient, in an indictment upon a statute, to set forth the offense in the words of the statute, does not meet the difficulty here. Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."

In the case of Armour Packing Company v. United States, 209 U.S. 56, 28 S.

Ct. 428, 436, 52 L.Ed. 681, the court discussed the Hess Case, supra, and said:

"But an indictment which distinctly and clearly charges each and every element of the offense intended to be charged, and distinctly advises the defendant of what he is to meet at the trial, is sufficient.

"And in Ledbetter v. United States, 170 U.S. 606, 612, 18 S.Ct. 774, 776, 42 L.Ed. 1162, Mr. Justice Brown, speaking for the court, said:

" 'Notwithstanding the cases above cited from our Reports, the general rule still holds good that upon an indictment for a statutory offense the offense may be described in the words of the statute, and it is for the defendant to show that greater particularity is required by reason of the omission from the statute of some element of the offense.' "

When the demurrer was overruled the trial judge granted the request made on behalf of the defendants for a bill of particulars, and a full and complete bill of particulars, to which no objection was made, was filed by the prosecution. While it has been held that a bill of particulars forms no part of the record for the purpose of deciding a demurrer (Dunlop v. United States, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799; United States v. Comyns, 248 U.S. 349, 39 S.Ct. 98, 63 L.Ed. 287), it has also been held that, while such a bill cannot supply the omission of an averment in an indictment, it may remove an objection upon the ground of uncertainty. United States v. Bayaud, C.C., 16 F. 376.

In the case of Wilson v. United States, 2 Cir., 275 F. 307, 310, certiorari denied 257 U.S. 649, 42 S.Ct. 57, 66 L.Ed. 416, the court said:

"It is simply whether the indictment sufficiently informed the defendant of what he must be prepared to meet, and, in case other proceedings should be taken against him for a like offense, whether the record shows with accuracy the extent to which a former acquittal or conviction might be pleaded. Peters v. United States, 94 F. 127, 36 C.C.A. 105. * * *

"But, if the defendants thought that it failed to apprise them of the nature of the accusation against them with that degree of certainty to which they thought themselves entitled, they had a right to ask for a bill of particulars. The right to such a bill may be confined to civil cases, in a few states. See People v. Alviso, 55 Cal. 230;

State v. Quinn, 40 Mo.App. 627; State v. Williams, 14 Tex. 98. But it is not so restricted in the federal courts, and, when the charges of an indictment are so general that they do not sufficiently advise the accused of the specific acts with which he is charged, the trial court has power to order a bill of particulars to be furnished. Kirby v. United States, 174 U.S. 47, 19 S. Ct. 574, 43 L.Ed. 890; Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606; Coffin v. United States, 156 U. S. 432, 15 S.Ct. 394, 39 L.Ed. 481; United States v. Brooks (D.C.) 44 F. 749; United States v. Bennett, 24 Fed.Cas. p. 1093, No. 14,571, 16 Blatchf. 338."

In the opinion in the case of Ledbetter v. United States, 170 U.S. 606, 18 S.Ct. 774, 776, 42 L.Ed. 1162, the Supreme Court discusses indictments, drawn in the exact language of the statute charged to have been violated, and states the general rule with respect thereto. There the court said: "The cases wherein it is held that an indictment in the exact language of the statute is not sufficient are those wherein the statute does not contain all the elements of the offense, as in United States v. Carll, 105 U.S. 611, [26 L.Ed. 1135], where a statute against passing counterfeit money failed to aver the scienter; but, where the statute sets forth every ingredient of the offense, an indictment in its very words is sufficient, though that offense be more fully defined in some other section." (Citing cases.)

In the case of Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 419, 76 L.Ed. 861, the Supreme Court said:

"The rigor of old common-law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' [Citing cases].

"Section 1025, Revised Statutes (U.S. C. Title 18, § 556) provides:

" 'No indictment found and presented by a grand jury in any district or other

court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant.'

"This section was enacted to the end that, while the accused must be afforded full protection, the guilty shall not escape through mere imperfections of pleading. We refer to a few of the many cases where the provision has been applied."

As was stated by the trial judge, in his charge to the jury, any doubt and uncertainty as to the meaning of the word "revolt" as used in the statute has been removed by many judicial decisions and by a statutory definition given in section 484, Title 18, U.S.C.A.

A study of these decisions leads us to the conclusion that the first count of the indictment is sufficient. The defendants were fully informed as to the charge against which they were called upon to defend themselves and the offense was also charged in sufficient detail to meet the requirements as to the plea of former acquittal or conviction in case other proceedings should be taken against them for a like offense.

With regard to the second count we are of the opinion that it, also, is sufficient. It charges a conspiracy to commit the offense and it is well settled that an indictment for conspiring to commit an offense need not describe the offense with the same certainty required in an indictment for the offense. As was said by Judge Parker, of this court, in Hill et al. v. United States, 4 Cir., 42 F.2d 812, 813: "An indictment for conspiracy to commit an offense need not describe the offense which is the object of the conspiracy with the same certainty as would be required in an indictment for that offense. [Citing cases.] When it charges in the words of the conspiracy statute a conspiracy to violate a criminal statute of the United States, and contains a sufficient description of the object of the conspiracy to fairly and reasonably inform the accused of the character of the offense charged, it is sufficient."

If, as we have concluded, the first count is sufficient, it necessarily follows that the second count is sufficient. The demurrer to the indictment was properly overruled.

As to the second question whether the defendants had a right to have the case tried by the judge and not by a jury, the trial court held, under the authority of Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 263, 74 L.Ed. 854, 70 A.L.R. 263, that before any waiver of a trial ·by a jury can become effective, the consent of government counsel and the sanction of the court must be had. In the Patton Case the Supreme Court said: "Before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the ex-. press and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity."

In the case of United States v. Dubrin et al., 93 F.2d 499, Judge Augustus N. Hand, of the Circuit Court of Appeals, Second Circuit, held to the same effect, stating that he regarded the opinion in the Patton Case to be an "explicit pronouncement" to the effect that the consent of government counsel and· the sanction of the court must be had in order to effect a waiver of trial by jury. See, also, People v. Scornavache, 347 Ill. 403, 179 N.E. 909, 79 A.L.R. 553.

As was clearly and forcefully stated by the learned judge below, in refusing the motion, trial by jury is the normal and preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses. The value and appropriateness of trial by jury have been established by long experience, and are not now to be denied. The right of an accused to a trial by a constitutional jury has long been regarded as an inviolable right to be jealously preserved and has become a sacred tradition of our judicial system.

It cannot be conceived how a trial by a jury, presided over by a judge, could possibly be prejudicial to an accused. It is not only the province but the duty of the judge to pass upon the verdict of the jury and the sufficiency of the evidence to support the verdict. Under these fundamental and elementary principles, invariably governing the administration of criminal law in our

courts; the accused, when tried by a jury, has every advantage he could possibly have in a trial before a judge alone. In effect he has a trial by the judge in addition to the trial by the jury.

The judge properly exercised his authority in refusing to sanction the waiver of a jury trial and the rights of the defendants were in no way prejudiced by the judge's action.

As to the third question, whether there was sufficient evidence to sustain the verdict of guilty, returned by the jury, a study of all the testimony taken at the trial shows that the defendants had all signed articles for the voyage upon which the Algic was engaged at the time of the happenings in question. By these articles they agreed to serve as seamen for a foreign voyage to last not more than 12 months and in express terms bound themselves for the duration of the voyage to "be at all times diligent in their respective duties, and to be obedient to the lawful commands of the said Master, * * * and of their superior officers, in everything relating to the vessel, and the stores and cargo thereof, whether on board, in boats, or on shore." The evidence conclusively shows that the defendants, as members of the crew, were parties to a concerted action that was a refusal to obey the orders of their superior officers and actually resulted in the authority on board the ship being transferred from the captain and the officers to the crew. The meeting of the crew, attended by all the defendants, was unauthorized and resulted in an usurpation of the actual command of the vessel until the captain called the crew together and told them of his instructions from Washington, when they abandoned their position. The refusal of the defendants to obey orders was repeated more than once and was a flagrant violation of their duty as seamen. The crew even decided when and how the steam should be shut off. It may have been, as testified by one of the defendants, that the crew wanted to see if the captain would "call our bluff." It was none the less a refusal to obey orders and inexcusable. In pursuing such a course the defendants assumed the hazard of their action. There was ample evidence to support the verdict of the jury.

As to the fourth question, whether the crew of which the defendants were members, had, under the circumstances, a lawful right to strike, we are confronted with the fact that what happened was more than a strike in the commonly accepted meaning of that word. Refusal to work might constitute a strike on shore but the shutting off of the steam constituted an assumption of authority over the ship and its cargo. Had a sudden storm come up, and it was shown that this was liable to happen in that harbor, the delay, necessary in turning the steam back on, might have resulted disastrously.

That seamen on a vessel, signed on for a voyage, work under different conditions from workers on shore and, must of necessity be governed by different rules, with regard to their right to strike, cannot be controverted. The laws of the United States concerning seamen, their rights and their treatment, are more liberal and more favorable to the seamen than the laws of any other country. Great care has been taken by Congress to safeguard their rights and protect them from injustice. They are given every opportunity to secure redress for any grievance they may have on their return from a voyage, and the consular officers of the United States are required by law to give them every protection. The number of seamen required to constitute a crew for a vessel of a certain class and the number of hours they may be required to work are fixed by statute. The articles required to be signed specify the standard of food to be given them on a voyage and severe penalties are imposed for their benefit when there is any withholding of their wages. They are insured against dismissal during the course of a voyage. These safeguards have not been thrown around workers ashore.

In view of the almost paternal attitude adopted toward them by the government it seems not only right and proper, but absolutely necessary, that seamen in their turn be required to render, while on a voyage, unquestioned obedience to the lawful orders of their superior officers, otherwise travel by sea would be made unsafe, uncertain, and impracticable. There must be some supreme authority in command of a ship on a foreign voyage. Away from the home country no immediate resort can be had to the authorities or the courts of the home government. The captain is obviously the proper person to vest with this supreme authority and as was said by Joseph P. Kennedy, then chairman of the United States Maritime Commission, in submitting an Economic Survey of the American Merchant Marine to Congress in November,

1937: "Shippers and travelers realize that disorderly vessels are likely to be unsafe vessels. Safety at sea is based upon order and discipline as much as, if not more than, the quality of equipment. 'Personnel is to material,' said the great Nelson, 'as three is to one'. The man with a rifle makes the army; good forecastle hands make the ship. The sea is no place for divided authority. When a man puts foot on the deck of a ship he becomes part of a disciplined organism subject to the navigation laws of the United States. Seamen must recognize that the nature of their calling, which gives them a unique status under the law, also imposes upon them obligations not common to shore occupations."

The Algic was owned by the Maritime Commission and being operated for the Commission. The merchant marine of the United States is fostered by law in the interest of the country generally and especially with a view to its use in the case of war. That order and discipline be maintained in the merchant marine at all times is necessary in the interest of the whole people of the United States and the interest of the whole people is at all times paramount to the interest of any group or groups.

It is contended on behalf of the defendants that the National Labor Relations Act, 49 Stat. 449, Title 29, U.S.C.A. § 151, in which the right of workers to strike is recognized, applies to seamen on a voyage. While this act may govern workers on vessels in some respects, as was held in Black Diamond S. S. Corporation v. National Labor Relations Board, 94 F.2d 875, decided by the Circuit Court of Appeals for the Second Circuit·on February 14, 1938,· there is nothing in the act to indicate that Congress intended to disregard the fact that working conditions of seamen differ from those affecting workers ashore, or that Congress intended to repeal the act upon which the indictment in this case is based. It is of interest in this connection that, in the year following the enactment of the National Labor Relations Act, Congress passed the Maritime Commission Act which deals particularly with wages and working conditions of American seamen. 46 U.S.C.A. § 1131.

■ When articles are signed by a crew for a voyage, all bargaining, individual or collective, is ended for the duration of the voyage. A contract is made, binding both owner and seaman, that is lawful, if the articles comply with the statutes, and should be lived up to scrupulously.

The laws of the United States require seamen to sign articles promising, during the voyage signed for, obedience to all lawful commands of their superior officers, and it certainly cannot be successfully maintained that there exists a right to strike in violation of the law.

As was said by the trial judge in his charge to the jury: "From time immemorial the perils of the sea have made it absolutely essential that there be some one person in command of a ship, because the lives and safety of everyone on board, including the value of the cargo of the ship which, in these days, sometimes runs into the value of millions of dollars, is dependent upon the wise exercise of judgment and discretion. Just as there must be a general of an army on the field of battle in absolute control whose final word must be taken, so, at sea, there must be a captain in charge of a ship, and the captain's word is taken and it must be acted on, not only by the crew, but by passengers, by stewards, by stevedores, by anybody and everybody, even though the captain makes a mistake."

The defendants contend that the crew ' of a vessel which is moored to a dock or is at anchor in a safe harbor have the right to strike and that the Mutiny Act, 18 U.S. C.A. § 483, has no application to seamen in such a situation. But that question is not· presented for decision in this case. As we have already pointed out, the Algic was not in fact moored to the dock or at anchor in a safe harbor, but was in such a position that the obedience of the crew to the orders of the master was essential to her safety. In such a case, the same rule is applicable as though the vessel were at sea, as this court decided in Hamilton v. United States, 4 Cir., 268 F. 15.

■ The defendants, under the circumstances shown by the evidence, had no right to strike, and the trial judge was·right in so instructing the jury.

It might well be held that on the trial of the case the attorneys for the defendants abandoned the contention for the right to strike. We find the following to have taken place at the conclusion of the court's charge to the jury.

"The Court: Well, then, I understand you take the position now that you did not claim there is any right at sea to strike

against the commands of the captain of the ship.

"Mr. McQuaid: We do not contend that in this case, your Honor.

"The Court: Well, gentlemen of the jury, if that is so, of course it is unnecessary for you to consider any further that aspect of the case. That is to say, that is now out of the case. It appears that I misunderstood Mr. McQuaid's position on that. And, of course, it is quite unnecessary for me to have told you that there was no right to strike when the defendants are not claiming the right to strike. Their claim is that they did not refuse to obey a lawful command, but they merely presented a protest; is that right?

"Mr. McQuaid: Well, if your Honor pleases, I am afraid I may not have stated it very clearly. I think what your Honor has in mind is this: In the oral argument for the motion for a directed verdict, we argued that there was a right existing to strike, but we do not think it is necessary to our defense in this case to say that, because we feel that there was a right to strike and we were justified in disobeying a lawful order, but we do not mean to contend that to this jury.

"The Court: Let me see if I can put it to the jury in just a brief way. Gentlemen of the jury, if you find that there was no resistance or refusal to obey a command, general or specific, of the captain of the ship, then the defendants are entitled to be acquitted, and the question of the right to strike does not arise. If, however, you find that there was a wilful refusal, in concert, to obey the lawful orders of the captain in this case, under the circumstances set out, then the right to strike by the seamen is no legal justification for their refusal to obey the commands.

"Does that put it the way you want it?

"Mr. McQuaid: Yes, sir."

However, in view of our conclusion as stated above that these defendants did not have the right to strike, it is not necessary to decide whether this contention was abandoned.

 The fact that the court below permitted some of the defendants to be cross-examined as to statements made by them, to agents of the Maritime Commission, on the return of the Algic to Jacksonville, is assigned as error. There is nothing in the record to show that the statements in question were obtained by duress or fraud or in any way violative of the constitutional rights of the defendants. These defendants offered themselves as witnesses and, on a proper cross-examination, were asked as to statements made by them. It is not necessary to cite authorities to the effect that defendants offering themselves as witnesses are subject to a proper cross-examination. The statements were not offered in evidence. In addition to this the matters about which they were asked in no material way contradicted the admitted facts.

 It is also assigned as error that the court permitted two of the defendants to be cross-examined as to an alleged desertion by them of the Algic while in a Brazilian port, on the voyage home after leaving Montevideo, it being contended that this was an effort on the part of the prosecution to prejudice these defendants, before the jury, by showing that they were guilty of another crime. We find that the questions were asked to test the credibility of the defendants who had voluntarily testified and that the captain was recalled and questioned for the sole purpose of contradicting them. There was no error committed. It is also true that desertion by a seaman is no longer a crime punishable with imprisonment. Section 19, c. 28, of the Act of December 21, 1898, 46 U.S.C.A. § 701, making desertion such a crime, was repealed by the act known as the LaFollette Shipping Act, 38 Stat. 1164, c. 153.

 The acts committed by the defendants at the time in question, under the decisions above discussed and the pertinent statutes, undoubtedly were an effort to make a revolt on board the Algic, and while, as stated by the judge in his order sentencing the defendants, and as shown by the light sentences imposed upon them, it was not a serious revolt, such as would have been one accompanied by force, it was a plain violation of the statute. The case of Weisthoff v. American-Hawaiian S. S. Co., 2 Cir., 79 F.2d 124, is relied on as showing that the facts proven did not constitute a revolt but merely constituted a labor dispute. In the Weisthoff Case, however, it appeared that the vessel was moored to a dock in the harbor of New York; and as indicated above the question there presented is very different from that involved here.

The contention of the defense that the action of the crew in notifying the officers that they would not work was merely a protest against working with strike breakers, and not a refusal to obey orders, was left

to the jury under a plain instruction from the court that if the contention of the defendants was believed a verdict of not guilty should be returned. The jury by its verdict of guilty rejected this theory.

The conduct of the judge throughout the trial and his charge to the jury were eminently fair to the accused. There was no error in the trial, and the judgment of the court below is affirmed.

Affirmed.