## SOUTHERN S. S. CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 7435.

Circuit Court of Appeals, Third Circuit.

May 6, 1941.

CLARK, Circuit Judge, dissenting.

Joseph W. Henderson and Randolph W. Childs, both of Philadelphia, Pa. (Adams, Childs, McKaig & Lukens and Rawle & Henderson, all of Philadelphia, Pa., on the brief), for petitioner.

Thomas I. Emerson, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Samuel Edes and Louis Libbin, National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

This is a petition by the Southern Steamship Company to review and set aside an order of the National Labor Relations Board directing the company to cease and desist from certain unfair labor practices in which the Board found it had engaged, to bargain collectively with the National Maritime Union of America as the exclusive representative of a specified unit of its employees, to offer reinstatement with back pay to five employees discriminatorily discharged, and, upon application to reinstate certain striking employees.

Following a hearing upon a petition to certify collective bargaining representatives the Board on July 16, 1937, directed an election to be held by a unit of the company's employees consisting of the unlicensed personnel employed in the deck, engine and stewards' departments on vessels operated out of Atlantic and Gulf ports, except wireless and radio operators, chief electricians on electrically driven ships, and junior engineers who hold licenses. The election was held on the company's seven vessels in October, 1937, and disclosed a majority in favor of the National Maritime Union of America. On January 26, 1938, the Board certified the Union as the exclusive bargaining representative of the employees in the unit mentioned.

Shortly after January 26, 1938, and at various times thereafter officers of the Union sought to arrange collective bargaining conferences with the company. The company, however, at all times refused to bargain with them. This it admits, although it denies that any effort was made by the Union to open negotiations prior to August 18, 1938. The Board, however, found upon substantial evidence that such efforts were made as early as the end of January or the beginning of February, 1938.

In defense of its refusal to engage in collective bargaining with the Union the company contends that the designation of the Union was invalid because the election was improperly conducted. Its complaint is that the Board at the election held on the first of its vessels refused, in the absence of consent of the labor organizations involved, to permit the company's representatives to be present to identify voters and to see that the election was properly conducted. At the elections held on the six other vessels such consent was given and the company's representatives were present.

A certification proceeding is of a nonadversary, fact-finding character in which the Board plays the part of a disinterested investigator seeking merely to as-

certain the desires of the employees as to their representation. Section 9(c) of the National Labor Relations Act, 29 U.S.C.A. § 159(c), confers a wide discretion upon the Board as to the manner in which this investigation shall be made. The Board may take a secret ballot of employees or utilize any other suitable method. It may, of course, call upon representatives of the employer to assist it in identifying employees appearing to vote. On the other hand it may take the view, as it evidently did in this instance, that since the presence of such representatives, unless consented to, might operate in some degree to coerce the employees and prevent them from expressing their free choice, some other means of identifying voters should be employed. The act confers no right upon the employer to have its representatives present and it is obvious that their presence is not essential to a fair election. Indeed it is not contended in the present instance that any person voted who was not entitled to do so, or that the election was conducted unfairly. The action of the Board in excluding the company's representatives was accordingly within its discretionary power. Marlin-Rockwell Corporation v. National Labor Relations Board, 2 Cir., 116 F.2d 586.

■ It follows that the company was guilty of an unfair labor practice in refusing to bargain with the Union as the chosen representative of its employees and that the Board rightly ordered the company to cease and desist from this unfair labor practice and, upon request, to bargain collectively with the Union as the exclusive representative of its employees included in the bargaining unit already described.

On July 17, 1938, one of the company's vessels, the City of Fort Worth, was at dock at Houston, Texas, in the course of a voyage from Philadelphia to Houston and return. On that day thirteen unlicensed seamen of the vessel met at the union hall in Houston to find out what had been accomplished by way of obtaining a bargaining conference with the company and passes enabling Union delegates to board its ships when in port. Upon being informed of the company's refusal to meet or bargain with the Union the men unanimously voted to go on strike the following day in order to compel the company to recognize the Union and issue boarding passes to its delegates.

At 8 o'clock A. M. on the next day, July 18th, while the vessel was moored to the dock at Houston, the strike was begun when Tracey, an oiler, failed to turn the steam "on deck" for the purpose of loading cargo. Pool, the first assistant engineer, discovered the failure of steam and was told by Tracey that the ship's unlicensed personnel was on strike for Union recognition and the issuance of boarding passes. Pool then said that he would put the steam on deck himself, and Tracey replied that in that case he would "have to take the firemen out of the fire room." When Pool turned the steam on, Tracey called upon the fireman on duty, Braun, a member of the Union, to join the strike, which he did. At this time Ferguson, a fireman, appeared to relieve Braun whose watch had ended. But Ferguson, who was also a Union member, refused to tend the fires and he and Braun promptly left to join the eleven other strikers who were seated on the poop deck, the general meeting place of the seamen when off duty. The second assistant engineer immediately took over the care of the fires and the ship's officers, with the assistance of the six unlicensed seamen who did not join the strike, then proceeded with the necessary operations for the loading of cargo.

At about 10:30 o'clock A. M. the ship's master, Captain Rudan, came on board. He at once informed the strikers that their conduct was in violation of the ship's articles which they had signed, and ordered them individually and collectively, to "turn to", which they each and all refused to do, Warren, their spokesman, telling him that they were striking for Union recognition and boarding passes. Captain Rudan then brought aboard a deputy United States Shipping Commissioner who informed the strikers that according to their articles they had agreed "to be obedient to the lawful commands of the master" and warned them that they were "subject to being logged two days for one" for not obeying orders. The men, however, refused to abandon the strike. Throughout the day they remained seated on the poop deck in an orderly manner. At no time were they ordered to leave the vessel; on the contrary they were in regular course, served their midday meal by one of their own number, Smith, a mess boy.

■ Late in the same afternoon, the company's local attorney, after telephoning its superintendent at Philadelphia, advised the Union's attorney that if the strike were called off he would recommend

that the company issue boarding passes to the Union's shore delegates, action concededly tantamount to Union recognition. Relying upon this promise the Union's attorney advised the men to terminate the strike which they did at 7 o'clock P. M. and resumed their stations. Finding the foregoing facts upon virtually undisputed evidence, the Board properly concluded that the strike was caused by the company's unfair labor practice in refusing to recognize and bargain with the Union.

The strikers having resumed their duties with the approval and consent of Captain Rudan and the other officers, the ship sailed on schedule the same night. During the return voyage to Philadelphia they performed their duties satisfactorily. Nevertheless Captain Rudan, after consulting the ship's officers, decided not to reship five of the strikers, Warren, Tracey, Ferguson, Pfuhl and Smith. Accordingly when the vessel docked at Philadelphia on July 25th and the crew signed off the shipping articles, these five men were informed that they would not be reshipped. During the return voyage the Union members of the crew had decided to strike if any one of their number were to be discharged upon arrival at Philadelphia. Accordingly when the other Union members of the crew learned of the discharge of their five fellow members, seven of them, Crassavaz, Reeves, Latham, Burns, Hughes, Neeley and Holt, left the ship in protest. One of them, Crassavaz, subsequently reshipped.

The Board found that the five seamen were discharged because of their active participation in the strike of July 18th, that their discharge constituted a violation of the act, and that it was because of their unlawful discharge that the seven other seamen went out on strike on July 25th. The Board accordingly ordered the company to offer reinstatement with back pay to the five seamen who were discharged and, upon application, to offer reinstatement to the seamen who went out on strike on July 25th. The company strongly urges that the order should be set aside because the five seamen were not discharged since their employment relation automatically ended when they signed off the shipping articles on July 25th, and because, if they were discharged, their discharge was warranted for reasons not connected with the strike, and in any case their discharge was justified since they had participated in an unlawful "sitdown" strike and had as sea-

men breached their shipping articles by participating in it.

■■ The statute, 46 U.S.C.A. §§ 563, 574, requires that seamen sign shipping articles at the beginning of each voyage and sign off the articles at its conclusion. The statute, however, was for the protection of seamen and was not intended "to forbid the parties from mutually undertaking to assure a crew the right to continue as employees and to re-sign if it desires after signing off articles at a voyage's end." National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 212, 60 S.Ct. 493, 497, 84 L.Ed. 704. In the present case the Board found that the tenure of employment of the company's seamen was not terminated by the mere expiration of shipping articles. This finding is fully supported by the evidence that new articles are ordinarily signed as the old articles are signed off and that in any case the seamen consider themselves engaged for the new voyage unless notified to the contrary. In this connection it is quite significant that the captain and other ship's officers in their testimony referred to the five men as having been "discharged" or "fired." All five had been previously employed for periods varying from six weeks to eighteen months. We find no error in the Board's conclusion that they remained employees after the expiration of the voyage and that they were discharged by the company.

■ Nor is there merit in the company's contention that the men were discharged for reasons unconnected with the strike at Houston on July 18th. There is ample evidence to support the Board's finding in this respect. Indeed the company's officers frankly gave as a principal reason for the discharges the refusal of the men to obey the ship's officers during the strike, and the other reasons now urged were not suggested prior to the hearing before the Board. When the company on the day following the discharges, wrote to the United States Inspector at Philadelphia advising him of the dismissals, it limited its reason to the fact that during the strike at Houston the men "refused to obey anyone connected with the ship's or Company's officials."

■ We accordingly come to the consideration of the principal contentions of the company, namely, that it had the right to discharge the seamen because the strike in which they had participated was an un-

lawful one and because they had violated the law of the sea and breached their shipping articles by participating in it. It is contended by the company that the strike was an unlawful "sit-down" strike and the discharge of the strikers was therefore justified under the rule laid down in National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. With this contention we cannot agree. The strikers were guilty of no violence or other unlawful conduct. They did not take or hold possession of the ship, as the captain and chief engineer both admitted at the hearing. They merely withheld their services during the eleven hours of the strike, without interfering in any way with the work of the officers and non-striking members of the crew. Sitting on the poop deck, the usual place for members of the crew to meet when off duty, did not make them trespassers, for the ship was their home and they were at no time ordered to leave it. We conclude that the strike was not so unlawfully conducted as to deprive the participants of the protection of the act under the doctrine of the Fansteel case.

Did the breach of their agreement in the shipping articles to obey the commands of the master deprive the striking seamen of the protection of the act and justify their subsequent discharge? We agree with the Board that it did not. In so holding we confine our consideration to the facts of this case. If the strikers had been guilty of criminal acts of violence or of forcible detainer of the vessel the doctrine of the Fansteel case would doubtless have justified their discharge by the company. If their refusal to obey the directions of their officers had taken place while their ship was at sea or at anchor in an unsafe port subject to the perils of the sea so that obedience was essential to the safety of the vessel their action might well have transcended the legitimate bounds of action in a labor dispute and have constituted a revolt or mutiny. Rees v. United States, 4 Cir., 95 F.2d 784.

In the present case, however, during the whole period of the strike the ship was safely moored to the dock in the harbor of Houston, a domestic port. The strikers were guilty of no unlawful conduct. While they withheld their services, sufficient steam was maintained for the operation of all of the ship's sanitary and safety appliances. The chief engineer admitted at the hearing that the ship was not in danger at any time. The question whether under such circumstances American seamen may strike without becoming guilty of a revolt or mutiny has received no recent adjudication.[1] Such modern authority as there is upon the right of seamen to strike is negative. So we find that Section 2 of the National Labor Relations Act does not exempt employers of seamen from its provisions, whereas it does expressly exempt carriers subject to the Railway Labor Act, 29 U.S. C.A. § 152. Also in two recent decisions by the Circuit Court of Appeals for the Second Circuit (Weisthoff v. American-Hawaiian S. S. Co., 79 F.2d 124, and Black Diamond S. S. Corp. v. National Labor Relations Board, 94 F.2d 875) the right of seamen to strike may be inferred.

In the Weisthoff case members of a ship's crew were allowed to recover wages earned although they had left the steamship before the termination of the voyage. They had shipped at San Francisco for a trip to Gulf and Atlantic ports and return. When in New York harbor the crew made demands upon the master, refused to work until their demands were satisfied and refused to leave the ship until police were called aboard. They then left. The court found that certain of their demands were justified and that the making of the other demands did not amount to a revolt or desertion. In the Black Diamond S. S. Corporation case the court affirmed the Board's order directing the reinstatement of seamen who went out on strike while their vessel was in port.

On the other hand in Rees v. United States, supra [95 F.2d 792], seamen who participated in a strike while their vessel,

---

[1] Justice Story, sitting at circuit, ruled on a number of occasions that the refusal by seamen to put to sea amounted to endeavoring to make a revolt. United States v. Hamilton, 1818, Fed.Cas.No. 15,291 (the vessel was in Salem harbor and the crew objected to the substituted master); United States v. Gardner, 1829, Fed.Cas.No.15,188 (the vessel was in Boston harbor and the crew demanded that they should have a day watch below in the forenoon during the whole voyage); United States v. Cassedy, 1837, Fed.Cas.No.14,745 (the vessel was in St. Helena and the crew objected to the substitution of the mate for the captain as master).

the S. S. Algic, was in the harbor of Montevideo, Uruguay, were found guilty of endeavoring to make a revolt in violation of Sec. 292 of the Criminal Code, 18 U.S.C.A. § 483. The defendants there contended that "the crew of a vessel which is moored to a dock or is at anchor in a safe harbor have the right to strike" but the court said that that question was not before it for decision because the "Algic was not in fact moored to the dock or at anchor in a safe harbor, but was in such a position that the obedience of the crew to the orders of the master was essential to her safety. In such a case, the same rule is applicable as though the vessel were at sea, as this court decided in Hamilton v. United States, 4 Cir. 268 F. 15." In Peninsular & Occidental S. S. Co. v. National Labor Relations Board, 5 Cir., 98 F.2d 411, seamen engaged in a sit-down strike. They took possession of the ship, refused to let the electrical equipment furnishing light or the pumps supplying the sanitary arrangements of the ship to be used, and refused to permit any food to be served to anyone but themselves. The ship was prevented from sailing and the passengers had to be sent ashore and housed at the expense of the company. The discharge of the strikers at the end of the voyage was held not to be an unfair labor practice.

It is, therefore, clear that upon authority the question of the right of seamen to strike under the circumstances of the case before us is still an open one. Upon reason, however, we think that there is no sound basis for depriving seamen of this right when, as here, their vessel is moored to the dock in a safe domestic port. Whether the right exists in a foreign port we need not now decide. There is undoubted-

ly a general rule of the maritime law which exacts from seamen implicit obedience to the commands of the master. The absolute power thus conferred upon the master is necessary at sea for the protection of the lives and property entrusted to his care. When his vessel is safely in port the necessity for such high power is largely gone. The Blake, 1 W. Rob. 73, 166 Eng. Reprint 500; Buddington v. Smith, 13 Conn. 334, 33 Am.Dec. 407; The South Portland, D.C., 111 F. 767.

In The Blake, supra, the English High Court of Admiralty held that the refusal by members of the crew, while the vessel was docked, to put to sea was not mutiny. Dr. Lushington, speaking for the court said (page 506 of 166 Eng. Reprint): "It is also to be observed, that the occurrence took place in port, where the ship was exposed to no hazard; and I draw a strong line of distinction between disobedience of orders in port, and any insubordination whatever when the vessel is on the high seas, where it might expose to destruction the ship, cargo, and the lives of all on board."

In The South Portland, supra, it was held by the District Court for the District of Washington that it was unlawful for a master to cause the imprisonment of a member of his crew in a foreign jail, because of his refusal, when the vessel was in port, to proceed on a voyage. It must be concluded, we think, that when a vessel is safely moored in a domestic port the maritime law does not require the denial to seamen of the right to strike which is now freely accorded their fellows who labor on the land. We note that students of the subject have reached the same conclusion.[2]

---

[2] Rothschild—The Legal Implications of a Strike by Seamen—45 Yale L.J. 1181, 1199 "None of the penalties imposed by law upon seamen for mutinous conduct or infractions of discipline were intended to apply to a peaceful strike in a port of safety. The law was intended to confirm the master's supreme authority on the high seas when the master, single-handed, must enforce his orders, disobedience to which may lead to his overthrow and imperil the safety of ship, passengers and cargo. No such dangers are threatened while the ship is moored to the dock in a port of safety. At most, the shipowner suffers a pecuniary loss through the delayed sailing of the vessel—a loss which is a lawful incident to all strikes, which uniformly depend for their effectiveness upon the interruption of production.

"Through the statute abolishing imprisonment as a penalty for desertion, which was enacted subsequent to the mutiny statute, seamen leaving a ship cannot be subjected to imprisonment in order to compel them to remain at work. Surely the mere fact that seamen, in the course of a strike, remain on board instead of leaving a ship moored in a port of safety cannot in itself make the difference between guilt or innocence of the crime of mutiny.

"Most of the cases discussing the rights of seamen are antiquated by economic developments. But it is implicit even in these cases, decided at a time when the right to organize was denied

The shipping articles, while containing a covenant "to be obedient to the lawful commands of the master * * * and of their superior officers, in everything relating to the vessel," did not contain an explicit agreement not to strike. The covenant to be obedient to the direction of one's superiors is implicit in every normal employment contract. The articles merely made explicit that implicit obligation. The breach of that obligation by the exercise of the right to strike was not ground for terminating the contract of employment. Section 2(3) of the National Labor Relations Act, 29 U.S.C.A. § 152 (3), makes this quite clear. Consequently the shipping articles did not bar the seamen's right to strike while their vessel was safely moored in an American port and the breach of the articles involved in the strike did not justify the subsequent discharge of the strikers. It follows that the Board was not in error in directing the reinstatement of the five discharged seamen and of the others who went out on strike on July 25th because of the discriminatory discharge of their fellow seamen.

One further point must be noticed. The Board ordered the company to reimburse public work relief agencies for sums paid to the five seamen ordered reinstated by them. This was beyond its power. Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——. The Board's order will accordingly be modified by eliminating this provision.

The order of the National Labor Relations Board is modified as hereinabove indicated, and as so modified is affirmed. A decree enforcing it as modified will be entered.

CLARK, Circuit Judge (dissenting).

In my humble judgment the National Labor Relations Board has here been guilty of a second disservice to wise industrial relations. I say second because the United States Supreme Court has already expressed its disagreement with their earlier approval of the so-called "sit-down strike".[1] I cannot, therefore, join my learned brethren in assenting to what I deem to be an-

and a strike by any class of workers was illegal, and when seamen quitting their ship could be imprisoned, that the unseaworthiness of a vessel was a grievance of which the crew might justifiably complain and which, if occasion required, they might properly combine to remedy.

"For it is the crew, not the owner of a vessel or even its passengers, which is primarily concerned with the seaworthiness of a vessel and which is in the best position to know whether there has been compliance with the regulations designed to promote safety at sea. But since action by individual members of the crew is ineffectual, collective action is necessary. To deny the right of seamen to take collective action is to destroy a safeguard necessary to supplement even the most vigilant administrative enforcement of the law.

"But safety at sea requires more than enforcement of safety regulations. It depends also upon a personnel made efficient not by 'discipline' but by decent working conditions. Such conditions are most effectively secured through the bargaining power of the seamen themselves rather than through legislative or administrative action. It should be self-evident that the right of seamen to organize and to strike where the ship is not thereby imperilled is essential to enforce compliance with statutory regulations and to secure decent working conditions, without which there can be no safety at sea.

"The law now acknowledges, and even favors the right to strike as essential to a satisfactory adjustment of industrial conflicts within the framework of a democratic society. Special circumstances of danger may deny seamen that privilege when at sea or in a port of refuge. But there can be no reason of policy, and no support in the doctrines of maritime law, for denial to seamen when in a port of safety of a right freely recognized in other classes of workers."

Sapiro and Frank—Mutiny at the Dock, 25 Cal.L.Rev. 41, 51. "The decisions of a by-gone day would hold that a refusal to obey lawful commands while the ship is docked is an endeavor to make or the making of a revolt. But recognition of the labor union and the right of labor to bargain collectively and to dramatize its demands by means of the strike is now an integral part of the social-industrial world and of the law that reflects the important changes in that world.

"The doctrines of Justice Story must be changed to make room for the expansions of understanding and social rights. When the crew of a ship, safely moored to a dock, strikes and refuses to work, in the effort to gain certain legitimate ends, for themselves and for others of their class, such action is no longer mutinous but is only a lawful incident in the exercise of the right of collective bargaining."

[1] N. L. R. B. v. Fansteel Metallurgical

512

other mistake. The Fansteel case declared a limitation on the National Labor Relations Act. The theory of that limitation has been much discussed. As is often the case in matters of statutory interpretation, there has not been unanimity either as to its basis or its scope.[2] It is clear, however, that the inferior federal courts have been directed to except from the reinstatement requirements of the act certain types of misbehaving employees. In the Republic case this court had occasion to attempt some classification of those types.[3] The attempt was successful insofar as success is implied in denial of certiorari.[4]

In the case at bar we are required to pass upon employee conduct in a special environment. That environment is the sea and the conduct is that of those who go down thereto in ships. The behavior of the seamen ordered reinstated by the Board consisted of a collective cessation from work on a ship moored to a dock in a foreign[5] port. On land such a cessation from work comes within the right to strike. That right has happily been an accepted part of our jurisprudence for many years.[6]

That does not and plainly cannot mean the right is absolute.[7] Mr. Justice Brandeis pointed that out some years ago saying: "The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. * * * Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike. Compare Aikens v. Wisconsin, 195 U.S. 194, 204, 205, 25 S.Ct. 3, 49 L.Ed. 154." Dorchy v. Kansas, 272 U.S. 306, 311, 47 S.Ct. 86, 87, 71 L.Ed. 248.

Our purpose here does not require any catalogue of exceptions. Courts and individual judges are not always in accord.[8] They search for an adjustment of the conflicting interests of both parties to the economic conflict in relation to their background as members of a community. By the same token, the test is not one of convenience. The weapon of the strike depends upon inconvenience to the employer

---

Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L. Ed. 627, 123 A.L.R. 599.

[2] Labor Law—Legal Status of Sit-down Strike—Legal and Equitable Remedies, 35 Michigan Law Review 1330 (comment); The Fansteel Decision: Protection of Striking Workers Under the Wagner Act, 33 Illinois Law Review 187 (comment); Labor Law—National Labor Relations Board—Effect of Employees' Misconduct on Right to Reinstatement, 38 Columbia Law Review 1507, 1508 (note); Hart and Pritchard, The Fansteel Case: Employee Misconduct and the Remedial Powers of the National Labor Relations Board, 52 Harvard Law Review 1275; Labor Law—National Labor Relations Act—Employee Misconduct as Barring Relief, 37 Michigan Law Review, 1256 (comment); Employee Misconduct Under the Wagner Act: Developments Since the Fansteel Case, 39 Columbia Law Review 1369 (note); cf. Weisiger, Reinstatement of Sit-down Strikers, 23 Minnesota Law Review 30.

[3] Republic Steel Corp. v. N. L. R. B., 3 Cir., 107 F.2d 472.

[4] Republic Steel Corp. v. N. L. R. B., 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1027.

[5] As contrasted with home—the port being Houston, Texas.

[6] Wright, Criminal Conspiracies and Agreements, § 12, p. 35; Martin, The Modern Law of Labor Unions, § 30 General Right of Workmen to Strike; Oakes,

Organized Labor and Industrial Conflicts, § 312 The Right to Strike—In General; Storey, The Right to Strike, 32 Yale Law Journal 99; Mason, The Right to Strike, 77 University of Pennsylvania Law Review 52; Labor Union—Right to Strike—Unlawful Interference, 9 Boston University Law Review 280 (comment); Nelles, The First American Labor Case, 41 Yale Law Journal 165.

[7] What right is?, one might reflect. In discussing that very precious right, that of free expression, I quoted Mr. Lippman: "There are, so far as I can discover no absolutists of liberty; I can recall no doctrine of liberty which under the acid test does not become contingent upon some other ideal. * * * For what every theorist of liberty has meant is that certain types of behaviour and classes of opinion better regulated should be somewhat differently regulated in the future." 124 Atlantic Monthly 616, quoted in Committee for Industrial Organization v. Hague, D.C., 25 F.Supp. 127, 131.

[8] Oakes, Organized Labor and Industrial Conflicts, § 313 Where Striking Involves Breach of Contract, § 314 Other Limitations on Right to Strike; Lowry, Strikes and the Law, 21 Columbia Law Review 783; Sayre, Labor and the Courts, 39 Yale Law Journal 682; Eskin, The Legality of "Peaceful Coercion" in Labor Disputes, 85 University of Pennsylvania Law Review 456.

and sometimes even to innocent third parties for its efficacy.[9] Its sanction in that aspect is one of the penalties of the warfare conception of labor relations. So the timing can be selected in terms of strategy rather than in terms of effective production.

One limitation of time has been recognized both by the cases and by statute.[10] That time is the time of another war, the war between nations rather than strife over what is a just proportionate share of the profits of production. It is dangerous for a country engaged in its own defense to accord to workers the right to impose upon its need to avoid the fatal "too late and too little". So it is dangerous for a community to accede to a timing which goes beyond inconvenience into peril. This is the philosophy expressed by that great Massachusetts lawyer and defender of the oppressed, Moorfield Storey, in his well-known article, The Right to Strike, above cited. Mr. Storey says: " * * * Therefore the right of the individual to leave his work must be subject to the *paramount right* of the public. The engineer who is running a train from one great centre to another can no more stop in the middle of his journey in some desolate place and tell his passengers he will not go on unless they pay him a considerable sum of money than a sailor aboard ship can mutiny to obtain some advantage to himself at the expense of the voyage. The principle admits no distinction. The people through their legislatures can and should insist that labor disputes shall be decided by judicial tribunals and not by civil war, and that we shall not all live subject to the danger of such war whenever labor leaders choose to bring it on." Storey, The Right to Strike, 32 Yale Law Journal 99, 105. (Italics mine.)

It is the philosophy also of the Wicks Bill [11] forbidding the abandonment of public conveyances, passed recently by the New York Legislature. Upon his approval thereof, another great counselor of the downtrodden, Governor Lehman of New York, stated that "no one with any common sense would interpret this Act as a denial of the right to strike". As a matter of fact I had always thought that was the philosophy of the labor movement itself. Certainly one remembers the return of engines to the roundhouse and the careful manning of pumps in the mines.

Should that philosophy be adjudged part of the National Labor Relations Act and so those who disregard it be excepted from the act's benefits? I think it should. And to so decide does not, in my belief, require me to differ with my brethren as to the present incidence of the crime of mutiny. Undoubtedly their view that Captain Bligh has been dead a long time finds current acceptance. I am pleased to note they cite some of the legal periodicals which are this writer's favorite pabulum. Let me add four more to their two.[12] I do not think the test is mutiny vel non. Such a holding leans too heavily on the felony-misdemeanor distinction of the land cases.[13]

It is true that only inconvenience and not danger may result from a particular cessation at the dock in a foreign port. To bottom a general whitewash upon that fact overlooks, in my opinion, the very essence of maritime traffic. Such essence, here, as in the air, is the "happy landing", the safe return of the vessel from its voyage. It may be that during the course of its journey a ship is in positions where its security is unaffected by the idleness of its crew. Some qualms are detectable by the narrowness of the majority's ruling.[14] The difficulty seems to me more fundamental. The Board and this court entrust the estimation of that security to the persons most likely to be biased. Shipwrecked passengers will take little satisfaction in the sailors' equivalent of the common and tragic, "didn't know it was loaded". Labor unions have been solicitous in their

---

[9] Frankfurter and Greene, The Labor Injunction, Chapter I, The Allowable Area of Economic Conflict.

[10] Right to Strike in War Time, 32 Harvard Law Review 837 (note); Injunction: Coal Strike Enjoined as Violation of the Lever Act, 5 Cornell Law Quarterly 184 (note); cf. Chafee, The Progress of the Law, 1919–1920, 34 Harvard Law Review 388, 400 et seq.

[11] P.L. (N.Y.) 1939, c. 927.

[12] Sit-down Strike on Shipboard, 23 Cornell Law Quarterly 302, 305, 306 (note); Seamen — Mutiny — Sit-down Strikes, 18 Oregon Law Review 128, 134 (note); S.S.Algic, 1 National Lawyers Guild Quarterly 144, 148; Labor Law— Right of Seamen to Strike, 37 Columbia Law Review 1294 (note).

[13] Employee Misconduct Under the Wagner Act: Developments Since the Fansteel Case, 39 Columbia Law Review 1369 (note).

[14] Would it be the same, for instance, if one instead of two hawsers were used?

advocacy of full crew laws. Maritime unions argue for the extension of maintenance and care of seamen beyond the voyage. Is it not inconsistent to break the care of passengers during the voyage and to suggest no crews at all? One of the authors above cited puts this argument in slightly different fashion. He says: "To advocate strikes on board a ship at its pier merely on the basis that, in such circumstances, the safety of lives and cargo is not endangered, is to take a short-sighted point of view. No doubt, while a vessel is in port, the immediate security of all concerned is not greatly jeopardized by the crew's refusal to do its duty. But it is not alone the immediate safety or the present security which must be considered. There is an ultimate safety which must be protected. For this there must be discipline at all times, whether the ship be at sea or tied to shore in the safest of harbors. A master who cannot control his crew in port is not likely to be able to control it at sea. To allow the seamen to resist lawful commands in one place is but to encourage similar resistance elsewhere." Sit-down Strikes on Shipboard, 23 Cornell Law Quarterly 302, 306, 307 (note).

To stop work on land just after a large order is received or to refuse to sail a ship which is away from her home port undoubtedly gives additional economic leverage. Inconvenience to consumers is one thing, danger to passengers is quite another. If the National Labor Relations Act may be used, as the Supreme Court has held, to deter employee misbehavior, the writer of this dissent can think of no better example or more useful occasion.