PENINSULAR & OCCIDENTAL S. S. CO.
v. NATIONAL LABOR RELATIONS
BOARD (INTERNATIONAL SEAMEN'S
UNION, Intervener).

No. 8781.

Circuit Court of Appeals, Fifth Circuit.

July 29, 1938.

Scott M. Loftin and Harold B. Wahl, both of Jacksonville, Fla., T. Paine Kelly, of Tampa, Fla., and Jno. P. Stokes, of Miami, Fla., for petitioner.

Charles Fahy, Gen. Counsel, National Labor Relations Board, Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, and Malcolm F. Halliday, all of Washington, D. C., for National Labor Relations Board.

Charlton Ogburn, of New York City, for intervener.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

FOSTER, Circuit Judge.

Peninsular & Occidental Steamship Company, hereafter referred to as the company, brought this proceeding to vacate an order of The National Labor Relations Board, hereafter referred to as the Board, entered March 15, 1938, upon charges of unfair labor practices affecting commerce, filed by the National Maritime Union of America. The Board answered, praying for enforcement of the order. International Seamen's Union intervened before the Board and in this court, on the side of the company.

The Board found that certain named members of the crews of the steamships Florida and Cuba were discharged for the reason that they had joined and assisted the National Maritime Union, which was an unfair labor practice in violation of Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1). The decision rests solely on this finding. The Board entered the usual order to cease and desist and post no-tices; and ordered the company to offer reemployment to some 145 members of said crews, without prejudice to their seniority or other rights and privileges, discharging if necessary those who had been hired to replace them, and to reimburse the discharged members of said crews for losses of pay and the reasonable value of maintenance on ship board.

It is unnecessary to discuss the many technical points raised by the company as the case may be more satisfactorily considered on the merits. It presents unusual features in that it arises from a fight between labor unions of which the employer is the victim. It is not a case in which there had been a strike and the employer had declined to re-employ some of the strikers; nor one in which the employer had assisted in organizing a company union. Extensive citation of authorities dealing with such cases would be superfluous.

It is settled that the Act, 29 U.S.C.A. § 151 et seq., is constitutional. Undoubtedly the Board had jurisdiction to receive and consider the complaint. In exercising its jurisdiction the Board was required to decide the case before it on all the evidence. 29 U.S.C.A. § 160(c). If it has done so its findings, if supported by relevant evidence of probative force, are conclusive.

The material facts are as follows. The company owns the steamships Florida and Cuba which operate on fixed schedules, making two or three trips a week, from Miami and Port Tampa, Florida, to Havana, Cuba, and return, carrying freight, express, passengers and the mail. All the members of their crews signed the usual shipping articles required by the navigation laws. On June 4, 1937, every member of the crews of the vessels, from the captains down, were members of labor unions, affiliated with the American Federation of Labor, with which unions the company had unexpired contracts fixing hours, wages and working conditions. These contracts were not outright closed shop agreements but they provided that the union had the right by preference to fill vacancies in the crew from its members, if competent men could be supplied. At the time these contracts were made the National Maritime Union, affiliated with the Committee for Industrial Organization, had not been organized.

On June 4, 1937, while the Florida was at dock in Miami, Marcus Elliott, a delegate of the National Maritime Union, requested

permission to go on board the ship. Permission was denied by the master and local superintendent but in an hour or so was granted by superior officers of the company, when the request was brought to their attention, and he went on board and talked to the men. The members of the crew in the stewards' department and the unlicensed members of the deck and engine room crews were then members of the International Seamen's Union. In the afternoon, shortly before sailing time, certain members of the crew demanded, through Elliott that the company recognize the National Maritime Union and that Elliott be permitted to transfer the union books of the crew from the International Seamen's Union to the National Maritime Union before the ship sailed. This was denied on the ground that the company had a preferential contract with the International Seamen's Union. However, Elliott was offered a pass to go on the voyage and change the books en route but declined. There was no complaint as to hours, wages or working conditions. The company requested the crew to take a ballot to determine which union was in the majority. This was refused. The members of the crew of the Florida who desired to change their affiliation to the National Maritime Union refused to do any work, went on a sit down strike, took possession of the ship, refused to let the electrical equipment furnishing light or the pumps supplying the sanitary arrangements of the ship be used and refused to permit any food to be served to anyone but themselves. The ship was prevented from sailing and the passengers had to be sent ashore and housed at the expense of the company. This resulted in suits for damages for delay. News of this strike was communicated to the crew of the Cuba, at Port Tampa. Practically all the unlicensed members of the deck and engine rooms crews and of the stewards' department on the Cuba decided to transfer their membership from the International Seamen's Union and also went on a sit down strike for the recognition of the National Maritime Union. The company wired the Board asking it to designate the bargaining agency for the crews. The Board declined, referring the request to the Department of Labor. The strike was settled through the intervention of a conciliator of the Department of Labor, the company agreeing to not discriminate against the strikers. The ships resumed their regular schedules. However, the dispute between the rival unions was not permanently settled and friction continued on the ships between their members.

About June 19, 1937, the members of the crew of the Cuba who still adhered to the American Federation of Labor unions refused to sail with the members who had joined The National Maritime Union and those in the engine room crew went on a sit down strike. The ships were then temporarily laid up by the company and the entire crews of both vessels were discharged. The International Seamen's Union demanded the right to supply crews for the vessels under their preferential contract and were permitted to do so. The ships again resumed their regular schedules and there was no further trouble. So far the facts are undisputed.

There was also evidence by members of the crew tending to prove certain remarks of the officers of the ships derogatory to the National Maritime Union and intended to induce them to abandon that union and rejoin the International Seamen's Union, with threats as to certain men that if they did not do so they would lose their jobs. Practically all the officers of the ships denied the statements attributed to them. The officers of the company denied having suggested or approved these actions of the officers of the ships. There was no evidence at all to show that the officers of the company, who alone had authority to discharge the crews, had participated in or ratified said actions of the ships' officers. Further, there was evidence tending to show that members of the crew contemplated further sit down strikes and sabotage. There was no evidence as to what members of the crew made these threats but the evidence was not rebutted.

The Board concluded it was immaterial that the crews had signed shipping articles, on the ground that the company had not made it a practice to terminate the employment of the crew at the end of each trip. Reliance is had on the case of Black Diamond S. S. Corp. v. National Labor Relations Bd., 2 Cir., 94 F.2d 875. We express no opinion as to that decision except to say it is not in point. There the bargaining agent had been designated by the Board before the crew was discharged and the employer had refused to deal with it. In this case the Board had declined to name the bargaining agent.

On American vessels sailing to foreign ports shipping articles are required to be signed on an official form by the master for the ship and by each member of the crew.

The term may be either for one or more round trips or for a definite time. 46 U.S.C.A. § 564 et seq.

The shipping articles for the Cuba and the Florida in force at the time were signed by their masters on the respective dates of May 17 and May 28, 1937, about one month before the crews were discharged for voyages from Miami or Tampa, Florida, to Havana, Cuba, and such other ports and places in any part of the world as the master might direct, and back to a final port of discharge in the United States, for a term of time not exceeding twelve calendar months. These shipping articles constituted individual contracts between the owners of the vessels and the crew, terminable at the will of either at the end of any voyage in the ports of Tampa or Miami. The Thomas Tracy, 2 Cir., 24 F.2d 372, and authorities cited therein.

There was no occasion to have new articles signed for each trip. All the crew did not sign the articles on the same day. Some of them did when the articles were first signed by the master but from time to time thereafter, as new members were added to the crew, they signed the articles as of the dates they entered service. By departing on a subsequent trip the original articles were automatically renewed, the rights of the parties were unchanged and either was at liberty to terminate the agreement when the ships arrived in their home ports in the United States.

The Board declined to give effect to the existing contract between the company and the International Seamen's Union, on the ground that a majority of the crews belonged to the National Maritime Union and the company had made no effort to ascertain the proper bargaining agency before the contract was made. This overlooks the facts that at the time the contract was originally entered into the National Maritime Union was not in existence and the company had asked the Board to designate the proper bargaining agency at the beginning of the trouble.

The right of an employer to make a contract with a labor union and to require membership therein as a condition of employment is expressly recognized by the Act. 29 U.S.C.A. § 158(3). The contract with the International Seamen's Union was a valid, existing agreement at the time the crews were discharged and no other bargaining unit had been designated. Under its terms the company was obliged to give its members preference in reemployment.

The Board gave weight to the testimony tending to show the remarks derogatory to the National Maritime Union and threats of discharge and no weight to the testimony in rebuttal; dismissed the sit down strikes as a closed incident not affecting the case; held the evidence that the men were contemplating further sit down strikes and sabotage unconvincing; held that there was no evidence to show the crew was incompetent; and that there was evidence to the contrary.

Conceding that the Board had the right to pass upon the credibility of the witnesses and reject testimony it did not believe, giving the testimony on behalf of the crew tending to prove persuasion to withdraw from the National Maritime Union and threats of discharge if they did not do so full weight, it amounts to no more than evidence of intent. Furthermore, it is susceptible of the construction that the officers of the ship were indulging in propaganda for their own unions, something in the nature of peaceful picketing, which is protected by law.

The evidence tending to prove threats of sabotage and further sit down strikes was admissible to show that the threats had been communicated to the officers of the ships. Whether they were actually uttered is immaterial if they were communicated to the officers of the ships, were believed by them and acted upon in discharging and refusing to reinstate the members of the crew.

The owners of vessels, their masters and other officers, are required to exercise the highest degree of care and skill for the preservation of the lives of passengers and crews and to safely transport the cargo. This duty is superior to all other considerations in the operation of ships. Implicit obedience to the lawful orders of the master is required on a vessel. Without that there would be no safety. Engaging in sit down strikes and taking possession of the ships, in defiance of their officers, was at least prima facie evidence that the crews were guilty of mutiny. 18 U.S.C.A. § 483. Hamilton v. U. S., 4 Cir., 268 F. 15, certiorari denied 254 U.S. 645, 41 S.Ct. 15, 65 L.Ed. 454. It is true these strikes had been settled without charges being made against the men but their actions in that respect would form a basis for considering their future attitude. A ship that is not manned

by a competent crew is unseaworthy. Propellor Niagara v. Cordes, 21 How. 7, 16 L. Ed. 41. No doubt the members of the crews were individually competent as seamen but that was not enough to show the crews were competent as a unit. It would be difficult to imagine any greater grounds of incompetency than disobedience of the lawful orders of the master and the possibility of mutiny. It would be gross negligence for a vessel to put to sea with that kind of crew. Only slight evidence would be necessary to bring notice to the owners and officers of a ship of the possible danger. The fact that individuals making threats were not identified instead of weakening the evidence would strengthen it as a basis for the exercise of discretion by the responsible parties. The possibility of danger could be attributed to the members of both unions. Therefore, it can not be said that it was not a necessary measure for the safety of the ships that the company should discharge the entire crews and replace them with other crews that would not be torn by dissension and probably be mutinous.

■ The Board has wide discretion in administering the Act but in doing so it must deal fairly with both parties to the controversy. It is the duty of the Board to decide the case before it on all the evidence. It is not at liberty to rely upon part of the evidence in support of its findings and put aside all other undisputed evidence. The only unfair labor practice charged was the discharge of the crews. Until that event occurred, on all the evidence in the record, the company had used every effort to comply with the law in good faith. It did not attempt to interfere with the members of the crews in joining an existing national union and promptly entered into a contract as to wages, hours and working conditions with that union. By agreeing to not discriminate against the members of the crew who were guilty of serious offences and by requesting the Board to designate the proper bargaining agency, the company again proved its desire to comply with the law in good faith.

When the Board declined to designate the bargaining agency, as it had authority to do, the company was not required to indefinitely continue the operation of its business under conditions it deemed unsafe. It was not the province of the Board to substitute its opinion for the considered judgment of the company in this respect.

■ The fundamental principle underlying the National Labor Relations Act is the guarantee to employees of the right of collective bargaining through representatives of their own choosing, without interference from the employer. It prohibits negotiation of labor contracts by the employer with any other union than the one selected by the employees. If there is a dispute between different groups of employees as to what organization of their own choosing should represent them, the Board has authority, and it is its duty, to designate the bargaining agent. The Act does not prohibit contracts with individual employees. Nor does it interfere with the normal right of an employer to select his employees or discharge them. National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Not only did the company have the right to make individual contracts, evidenced by the shipping articles, but was required by law to do so. The right to discharge one or all the members of the crew at the home port at the end of the voyage was a legal right unimpaired by the Labor Relations Act. The exercise of that right could not, standing alone, be considered coercion. Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960. The company was amply justified in discharging the crews for the benefit of the public. No other bargaining agent having been designated by the Board, in employing new crews the company was bound by its contract to give preference to the International Seamen's Union. Had it not done so it would have been subject to charges for violating the Act.

The Board found that members of the crew were discharged for the reason that they had joined and assisted the National Maritime Union, which was an unfair labor practice in violation of section 8(1). That the members of the crew were discharged and not reinstated is undisputed, but the gist of the unfair labor practice is that they were discharged on account of union membership or activity. The reason for their discharge is the principal issue in controversy, and if they were discharged on account of threats of sabotage, etc., and not on account of union membership or activity, there was no unfair labor practice.

On all the evidence in the case, the company, in the circumstances shown, was not guilty of violating the National Labor Relations Act. The findings of the Board are

not supported by evidence within the meaning of the law. It follows that the petition of the company to annul and set aside the order must be granted and the application of the Board to enforce the order must be denied. There will be judgment accordingly.

SIBLEY, Circuit Judge (concurring).

In addition to what Judge FOSTER has said I wish to emphasize one thing. The Board found that the crew members they ordered reinstated "were discharged for the reason that they joined and assisted the NM U." This finding was rested mainly on acts and statements attributed to certain inferior ship's officers which indicated opposition to the NMU. It clearly appears that the decision to discharge all the crews and tie up the ships was made by the Company's officials, as was the decision to reemploy crews and sail them again. The motives and intentions of the officials who made these decisions are to be attributed to the Company, and not those of ship's officers who had nothing to do with the decisions. The Company's officials took charge of the situation and such authority as the ship's officers might ordinarily have had to act and speak for the Company in the matters at issue was superseded. The evidence does not show that the Company's officials were guilty of an unfair labor practice, but shows that they acted fairly and in good faith, and with due regard for their duty to the public and to their contracts with their employees.