## TEXAS CO. v. NATIONAL LABOR RELATIONS BOARD (NATIONAL MARITIME UNION OF AMERICA, Intervener).

### No. 9518.

Circuit Court of Appeals, Ninth Circuit.

May 23, 1941.

STEPHENS, Circuit Judge, dissenting in part.

Albert E. Van Dusen, of New York City, J. A. McNair, of Los Angeles, Cal., and James H. Pipkin, of Houston, Tex., for petitioner.

Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Frederick M. Davenport, Jr., and Edward J. Creswell, Attys. National Labor Relations Board, all of Washington, D. C., for respondent.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

Petitioner, owning and operating a fleet of ocean going gasoline and oil tankers, admittedly engaged in interstate and foreign commerce, petitions to have set aside an order of the National Labor Relations Board (a) ordering petitioner to cease and desist from the unfair labor practice of discouraging the organization of its crew employees from collective bargaining; (b) ordering the payment of back pay to one seaman and the reinstatement with back pay of another, found by the Board to have been discharged because of their activities as representatives of the crew in attempted collective bargaining with their captains; and (c) ordering the posting of cease and desist notices on all its vessels. The Board

cross-petitions for a decree enforcing its order.

Concerning the discharge of the two seamen, we consider the proceeding before the Board as conducted with a complete disregard of the body of Congressional safety legislation for the manning, navigation and management of vessels created to protect the lives of the members of the crew. The particular statutes here applicable are later considered, but the titles for the continued enactments for the last 75 years regulating officers and seamen of merchant vessels proclaim the primary purpose of Congress to be the "better Security of Life on board of Vessels," etc., "the better protection of life," "to promote safety at sea," "the further protection of Seamen" and "for the protection of such seamen."[1]

The Board here seeks to have us hold that the captain of the ocean going steamer "Nevada" should have retained on his ship as boatswain, the general superintendent over the crew (under the licensed officers), one Buckless, a habitual drunkard, who had been elected one of the "Nevada's" labor leaders. The Board would have us hold this, although the Board itself holds in the same proceeding that Buckless' habitual drunkenness warranted his discharge from the steamer "Washington" *less than two months* after his discharge from the "Nevada."

The testimony of the "Nevada's" officers of Buckless' drunken habits was uncontradicted and the Board finds that "the evidence does not entirely support" Buckless' denial that his drunkenness interfered with the performance of his duties in superintending the sailors. Instead of giving the officers' testimony the consideration required by the principles stated in Peninsula & Occidental S. S. Co. v. N. L. R. B., 5 Cir., 98 F.2d 411, 414, certiorari denied 305 U. S. 653, 59 S.Ct. 248, 83 L.Ed. 423, apparently no consideration was had of the concept that a ship's captain should eliminate a habitually drunken seaman *before* his conduct could endanger all on board.

The duties and obligations of the master of the ship in making up and controlling his crew cannot be determined by the study of the management of, say, a great auto-

mobile factory. An automobile factory is not a moving mass of steel floating in the ocean, whose propulsion must be controlled by instant intelligent co-operation of commander and his seamen and engineers while driven through a storm or the obscuration of rain, fog or smoke in heavily traveled shipping lanes or in approaching and passing through narrow channels with cross tidal and river currents, or, as for four years from 1914 to 1918 in the Great War, in the zigzag maneuvers of a convoy, or, steaming alone, in avoiding a submarine or dodging a torpedo,—the latter situations not beyond the reasonable contemplation of the Board at the time of the writing of its briefs and of its argument.

Nor is the psychology of the workers in a mill, living in their comfortable homes with their families and with diversions of modern town life, the gauge for the seaman's mind, living in necessarily cramped quarters, though vastly improved now through the pressure of their labor organizations, having 16 hours unoccupied time between watches, without the recreations and diversions which come to men living ashore.

In the life of factory workers are no such dangers as require a maximum of ten years penal servitude for one who by force, fraud or intimidation resists or prevents the master in the free and lawful exercise of his authority,[2] nor is there need for a maximum two year sentence for assaulting a mill superintendent as there is for assaulting a ship's officer,[3] nor for giving a mill superintendent authority to place his employees in irons on bread and water, with full rations only on every fifth day, for continued wilful disobedience of lawful commands or neglect of duty at sea.[4] The mill manager fires such employees outside the yard gates. The master must have the power to compel the services of such men for the safety of all on board. This distinction between the two employments is the basis of the holding of the Fourth Circuit in Rees v. United States, 95 F.2d 784, 792.

In our opinion the Board has erred in failing to recognize that these maritime safety laws are paramount to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., wherever the Board's proposed orders

---

[1] Successively these titles are in 16 Stat. 440; 35 Stat. 55, 46 U.S.C.A. § 222; 38 Stat. 1164; 17 Stat. 262, and 30 Stat. 755, 757.

[2] Criminal Code, § 293, 18 U.S.C.A. § 484.

[3] 46 U.S.C.A. § 701, subd. 6.

[4] 46 U.S.C.A. § 701, subd. 5.

may increase the danger which the long established safety legislation of Congress seeks to prevent or lessen.[5]

It needs but an extreme illustration to make clear our views of the supremacy of the maritime safety laws to those not familiar (as the Board here appears) with the universal hazards of navigation, and particularly in this case, in the management, in port and at sea, of vessels carrying highly explosive and inflammable cargoes of gasoline and oil. Unlike general cargo vessels, the tanker is subject to the dangers of her peculiar cargo in port as well as at sea. In some respects that menace is heightened in loading and discharging.

Take, for such illustration, the situation of any steamer just leaving dock, at dusk and in hazy weather, to traverse a harbor crowded with moving vessels. There the highest vigilance is required of the lookouts in the bow to warn of the presence and movements of other vessels, the smartest and most concentrated attention of the helmsman to orders for immediate change of course and of the sailor or officer telegraphing the orders to the engine room for a change of speed or a reverse. If at that moment the two elected representatives of the vessel's labor organization should make a vigorous and disturbing appeal to the lookout, helmsman and man at the engine room telegraph to demand the righting of some claimed wrong in the treatment of the crew, it is apparent that *because the two men are labor organizers* there is the greater reason for their discharge the moment the safety of the vessel permits. Their organizing power and the prestige of their representative position make their appeal for the righting of grievances, *at such a time,* the greater menace to the lives of the crew they represent.

If a seaman without the power and prestige of such union authority were to start such a discussion at such a time he probably would be told in seamen's vernacular to "get the hell out of here" and no harm be done. Quite likely in the discipline of the ship, her captain would give such an intruder no more than a vigorous tongue lashing. However, the captain properly would be deprived of his license by the Inspectors in the course of the Congressionally created proceedings[6] following a collision and a sinking and drowning of some of the sailors caused by such distracting interference of the labor leaders, if he failed to discharge them and log them as discharged, *because of the abuse of their power as such leaders.* And this, although the abused power is one the proper exercise of which is protected by the National Labor Relations Act.

It may be said that the above is an occurrence too remote in likelihood to be of illustrative value. To be sure, sober-minded men so would not risk their own lives and those of their mates. But is such a situation unlikely with a labor agitator who is a habitual drunkard and who is shown, by uncontradicted testimony, repeatedly to have boarded his vessel in various intensities of intoxication? In this proceeding it is of outstanding importance that the Board was dealing with a hundred percent labor crew furnished the Texas Company by a C. I. O. union, in which crew, the Board's brief admits, there was "repeated drunkenness" from the drinking which was "especially prevalent."

Indeed, from the condition which the Board found on the "Nevada", it would be over straining human self-control if some of its officers contemplating the command of the vessel in dangerous emergency, with the admitted combination of the unionization of his vessel and the drunkenness of his crew, which had elected a confirmed drunkard as their labor leader, did not sometimes think what one of them said: "Just a minute, there is one thing I want to tell you we don't allow on this ship, and that is getting drunk, missing watches, and we don't allow any agitation with the crew on this union business."[7] The question here

---

[5] Dangerous enterprises on land have similar protective legislation involving appraisal of their relationship to the National Labor Relations Act. The highly specialized economic and social life on a ship at sea warrants the consideration here extended.

[6] 46 U.S.C.A. § 239, as amended 49 Stat. 1381, considered infra.

[7] Note by Denman, C. J., individually: Lest the inference be drawn that unionization and drunkenness are necessarily connected, it may not be irrelevant for the writer of this opinion to state that he left his practice and from 1919 to 1926 had final authority in the management of a fleet of coastwise vessels operating between Pacific Coast ports. By his choice, and without agreement or negotiation, the crews were one hundred percent unionized,—that form of crew organization seeming to yield the greatest

is whether a ship's captain is deprived of the power to make his ship safe for all the lives entrusted to his care by discharging a drunken boatswain con amore because he is a drunken labor leader.

It requires no straining of judicial notice to realize the position of the labor leaders of the crew in the closely knit social organization of the confined area of the vessel, often heated by jurisdictional contests of rival unions. The men elected to represent the crew or a part of it, can make or break the discipline necessary in the vessel's navigation and management for the safety of everyone on board. In a way they become the social arbiters of their followers. Their example is "an imponderable of the heaviest weight" as a witty Irish M. P. is reported to have put it. There is an old sea saying that "a drunken captain makes a drunken crew." It well may be equally true of the crew of a ship having a drunken labor leader.

■ It is a given quantity in a ship captain's command that a varying percentage of his crew overindulges in intoxicating liquor.[8] It is a necessary part of his management to exercise a wise discretion in eliminating those who are not fit as lookout or at the wheel or engine room bells because of dullness of mind and nerve response when emerging from intoxication or because actually intoxicated when at station. One false shout from the bow, one failure in instant dropping anchors, one wrong turn of the wheel, or one wrong pull at the telegraph well may send the vessel crashing through the fog into another or on the rocks.

Particularly dangerous are drunkenness and the ensuing dullness in the crew of a gasoline or oil tanker. This court has had occasion to consider the menace of gases coming off oil cargoes in the case of McGill v. Michigan S. S. Co., 9 Cir., 144 F. 788, 790, where by a fuel oil gas explosion a steamer was blown in two, with a large loss of life, while lying at dock in San Francisco harbor. The confined spaces of a tanker well may contain such dangerous gases from leakage from her oil compartments. A drunken or drink-dulled man, not realizing the oil gas fumes, may throw his lighted cigarette or match or empty his pipe ashes and send everyone to the bottom. With a gasoline cargo drunkenness is an even greater menace. Obviously the menace is further heightened by the presence in the crew of a habitual drunken labor leader, also boatswain, setting the example of intoxication to the men under him.

The exercise of the captain's discretion in the make-up of a crew to afford the safety to all in the hazards of maritime employment cannot well be appraised by the after-wisdom of judges in chambers and officials at their desks. That after-wisdom will not raise a wreck from the bottom of the sea, or resurrect the drowned or explosion-shattered members of a crew.

Congress in its statute of February 28, 1871,[9] gave to the local boards of inspectors the power to suspend or revoke the licenses of a master who has "endangered life" or has been "guilty of * * * negligence" in the performance of his duties. In present day practice the sailors often are supplied through union or other hiring halls. Nevertheless, a captain is "guilty of * * * negligence" if he fail to see to it that the crew shall be a true "complement" "sufficient" for the safe conduct of the voyage, as required by that Act. Where a crew is not first chosen by the captain, he must promptly weed out any who constitute a menace to his general discipline or to the safe navigation of his ship.

■ A crew is not a "complement" or "sufficient" simply because there are enough individuals to fill all the positions required by the United States Inspectors under 46 U.S.C.A. § 222, R.S. § 4463, as amended in 40 Stat. 548. This court considered and decided that question with reference to the Chinese crew of the "City of Rio de Janeiro." We denied a limitation of liability to the Pacific Mail Steamship Company because the Chinese, though shown to be excellent sailors, could not understand the commands of the white officers and hence the lifeboats were not launched in sufficient time to save the people on board. Concerning the duty both by the general maritime law and under section 4463 of the Revised

sobriety and efficiency in the fleet's operations. What the court is considering in this opinion is the Board's view of the conditions prevailing on one particular vessel.

8 Cf. The provision for suspending or revocation of officers' licenses for in-

temperate habits. Captains, 46 U.S.C.A. § 226; Mates, id. § 228; Engineers, id. § 229.

9 R.S. § 4450, now expanded by the Act of May 27, 1936, 49 Stat. 1381, 46 U.S. C.A. § 239.

Statutes, now 46 U.S.C.A. § 222, we stated and held: "It is, as was said by Judge Hawley in Re Meyer (D. C.) 74 F. [881] 885, 'the duty of the owners of a steamer carrying goods and passengers, not only to provide a seaworthy vessel, but they must also provide the vessel with a crew adequate in number, and competent for their duty with reference to all the exigencies of the intended route'; not merely competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen, such, for example, as unfortunately did happen in the present case—the striking of the ship on a reef of rocks—and the consequent imperative necessity for instant action to save the lives of passengers and crew. The duty rested upon the petitioner to be prepared for such an emergency, not only by reason of the statute cited, but by the general maritime law. In the case of The Bark Gentlemen, Olcott [110], 115, Fed.Cas. No. 5;324, it was held that the owners were liable for furnishing an inadequate crew, which they shipped at the Gambia river, West Africa, large enough in numbers, but sick with fever. In Tait v. Levy, 14 East, 482, it was held that, where the captain did not know the coast, and entered the enemy's port, and was captured, the vessel was 'incompetently fitted out,' because there was no proper master for the purpose of the voyage. In Parsons v. Empire Transportation Company [9 Cir.] 111 F. 202, 208, 49 C.C.A. 302, we held that, where the owners appointed an incompetent superintendent. to manage ships in Alaskan waters, they were not entitled to a limitation of liability for loss arising from sending out a barge in wintry and stormy weather. There can, in our opinion, be no doubt that the crew of a ship must be not only sufficient in numbers, but also competent for the duties it may be called upon to perform. * * *" In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 82, 69 L.R.A. 71.

It is obvious that drunken or drink-dulled sailors on lookout or at the wheel well may be as great a menace as the fever stricken crew on the wrecked bark "Gentleman", or as the Chinese at the lifeboat falls of the "Rio de Janeiro," who could not understand the commands of the officers ordering their launching.

■ For these reasons we refuse to hold that the habitual drunkard Buckless should have been retained as boatswain to superin-

tend the crew of the "Nevada", or order that the Texas Company make good to him any back pay. We conclude that such an order would not only be in derogation of the efficient enforcement of the Congressional maritime safety laws, but that it would bring discredit to the National Labor Relations Act instead of effectuating its purpose.

■ With regard to the Board's petition for a restoration of one Rosen, another labor leader on the "Nevada," to the position of quartermaster (helmsman), it is apparent that the issue of the propriety of his discharge was tried by a Board having a misconception of the captain's duty and obligation to all on the vessel with regard to their safety. It appears that after Buckless' discharge, Rosen, as labor leader, proceeded to agitate among the seamen against the captain for his entirely justifiable action. Nothing could be more disruptive of the necessary respect due the captain's proper decision in matters of ship discipline. The fact that Rosen was a labor leader heightened the wrong. During Rosen's active leadership there had been threats of an illegal sit-down strike of the crew because there was among them one member of the International Seaman's Union. There was a jurisdictional dispute between his C. I. O. union and the I. S. U. and Rosen used the structure of the vessel itself to display on her side a large C. I. O. banner as she came into port. A labor leader so actively engaged in jurisdictional and other agitation among the crew, in part highly improper and in part justified, well may have been absent from his station and inattentive to his duties, as testified by the ship's officers. Cf. Peninsula & Occidental S. S. Co. v. National Labor Relations Board, supra. It is of note that three other active labor leaders not shown to have engaged in conduct subversive to the ship's necessary discipline remain as members of the crew.

Since the entire proceeding was conducted with such an ignoring of the long established Congressional legislation for the protection of life at sea and with such a misconception of the powers of a ship's officers and managers necessary in such protection, we deem it for the best interests of the participating parties and for labor legislation generally to remand to the now reconstructed[10] Board the proceedings lead-

10 Cf. Opinion of Mr. Justice Frankfurter in Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 487, 59 S.Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466.

ing to those portions of the Board's order, other than that concerning the discharge and back pay of Buckless, for a reconsideration—having in view this opinion. Ford Motor Company v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221; National Labor Relations Board v. Cowell Portland Cement Co., 9 Cir., 108 F.2d 198, 206; National Labor Relations Board v. Sterling Electric Motors, Inc., 9 Cir., 118 F.2d 893, 897.

We deny enforcement of the order so far as it concerns the discharge and back pay of Buckless.

STEPHENS, Circuit Judge (specially concurring in part, dissenting in part).

I concur in the denial of enforcement of the National Labor Relations Board's order so far as it concerns the discharge and back pay of Buckless, and base my concurrence generally upon the intemperance of this seaman. However, since I am unable to agree completely with the majority opinion upon this subject I confine my concurrence to the result reached.

I believe the order should be enforced as to all other issues and register my dissent as to the conclusions reached by my associates in regard thereto.