778 F.2d 1037
 1986 A.M.C. 2731
 In the Matter of the Complaint of ROY CROOK AND SONS, INC.,
as Owners and/or Charterers of the M/V LADY PATRICIA in a
Cause of Exoneration From or Limitation of Liability, Civil
or Maritime, Plaintiff-Appellee,
v.
David Ray ALLEN, Individually and as Executor of the Estate
of Newell Frank Allen, Sr., Yvette Marie Allen,
Pamela Eleanor Allen and Newell Frank
Allen, Jr., Claimants-Appellants.
 No. 84-2753.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 17, 1985.
Opinion on Denial of Rehearing Jan. 15, 1986.
 
 Barnhart, Mallia, Cochran & Luther, John N. Barnhart, Mary L. Malone, Houston, Tex., for claimants-appellants.
 Ross, Griggs & Harrison, James E. Ross, Patricia Kay Dube, David A. Furlow, Houston, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before ALVIN B. RUBIN, RANDALL and JERRE S. WILLIAMS, Circuit Judges.
 RANDALL, Circuit Judge.
 
 
 1
 Captain Newell Allen drowned in the Gulf of Mexico on July 5, 1981, while attempting to bring in the anchor of the M/V Lady Patricia, a ship then owned by Roy Crook & Sons, Inc. After a two day non-jury trial, the district court calculated the value of the loss to the claimants (Allen's family) at $384,204. However, the court further found that Captain Allen had been seventy-five percent contributorily negligent, so the amount which the claimants were awarded was reduced to $96,051. The Allens appeal. We reverse and render judgment for $384,204.
 
 I.
 
 2
 At one o'clock in the morning on July 4, 1981, the M/V Lady Patricia, a ship owned by Roy Crook & Sons, Inc. ("Crook") lay dead in the water near the Griffith Alexander rig in the Gulf of Mexico. At the time, two men were aboard: Captain Newell Allen and a deck-hand named Ruiwess. The Lady Patricia is sixty-five feet long and has a capacity of eighty-nine gross tons. It operated under a Coast Guard Certificate of Inspection which required a crew of two ocean operators and two deck-hands.[1]
 
 
 3
 At noon on July 4, another vessel, the State Ebony, used compressed air to restart the Lady Patricia's propulsion engines. The Lady Patricia, still without the power of her diesel-driven generators, was unable to hoist her anchor. The anchor was therefore left at sea, with an ice chest serving as an improvised buoy to mark its location. At eight o'clock that evening, the Lady Patricia arrived in port at Ingleside, Texas. Scotty Crook, the vice-president of Crook, was there to meet her. The deck-hand Ruiwess quit. Vice-president Crook got James Crume to serve as the deck-hand replacement. Vice-president Crook then sent the Lady Patricia back to sea, to recover her anchor and to continue servicing the Griffith Alexander rig.
 
 
 4
 When the ship arrived at the site where the anchor had been dropped, Crume tried for three hours to raise it. Eventually, Captain Allen undertook to assist him. He became entangled in the line and was pulled overboard. Crume's efforts to reach Captain Allen with a life preserver were unsuccessful, and Captain Allen drowned.
 
 
 5
 Crook filed a petition seeking exoneration from or limitation of liability. Captain Allen's wife and children (hereinafter "the Allens") appeared as claimants opposing Crook's motion. The court denied Crook's petition for exoneration or limitation, but it held that Captain Allen had himself been seventy-five percent responsible for the accident. From this finding of contributory negligence, the Allens have appealed.
 
 II.
 
 6
 The Allens' action arose under the Jones Act, 46 U.S.C. Secs. 688 et seq., which provides seamen (or their executors) an action for personal injury or death. The rights enjoyed by seamen against their employers under the Jones Act are the same as those enjoyed by railroad employees under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. Secs. 51-60. The Jones Act explicitly incorporates the FELA. See 46 U.S.C. Sec. 688; see also Gilmore & Black, The Law of Admiralty Sec. 6-26 (2d ed. 1975). Section 53 of the FELA provides as follows:
 
 
 7
 In all actions ... brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.
 
 
 8
 The Allens argue on this appeal that Section 53 bars a finding that Captain Allen was contributorily negligent. They point out that the Lady Patricia was required to be manned by a crew of four, but that on the day that Captain Allen drowned she was manned by a crew of only two. By supplying the Lady Patricia with a deficient crew, Crook violated a "statute enacted for the safety of employees." This violation contributed to Captain Allen's death. Hence, the Allens conclude, Section 53 bars a finding that Captain Allen was contributorily negligent.
 
 
 9
 The application of the FELA to Jones Act cases was discussed by the Supreme Court in Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1957). The precise question addressed by the Court was "whether, in the absence of any showing of negligence, the Jones Act--which in terms incorporates the provisions of the FELA--permits recovery for the death of a seaman resulting from a violation of a statutory duty." 355 U.S. at 431, 78 S.Ct. at 397. The Supreme Court held that it does. 355 U.S. at 432, 78 S.Ct. at 398. The Court ruled in addition that when an employee is injured as a result of the employer's violation of a statute, the employer must pay damages even if the injury the employee suffered was not an injury that the statute was specifically aimed at protecting against. 355 U.S. at 432-33, 78 S.Ct. at 398-99.
 
 
 10
 Kernan involved a suit brought by the widow and children of a seaman who had died as a result of a fire which was caused in part by the employer's violation of a Coast Guard navigation rule. That rule required that kerosene lamps on tugs (such as the one the seaman had been on) be kept at least eight feet above the water. The fire which led to the seaman's death broke out when a kerosene lamp ignited vapors lying above the surface of the water. The lamp had been only three feet above the water. The district court found that although the fire would not have started had the lamp been carried at the required height, the regulation was intended to safeguard navigation, not to prevent fires. Accordingly, since there had been no collision or other error in navigation, the district court declined to impose liability on the employer.
 
 
 11
 The Supreme Court reversed. The Court reviewed the line of cases involving liability under the FELA and explained that in cases involving a violation of either the Safety Appliances Act or the Boiler Inspection Act, there is liability "without regard to whether the injury flowing from the breach was the injury the statute sought to prevent." 355 U.S. at 433, 78 S.Ct. at 398. But the Safety Appliances and Boiler Inspection Acts were not implicated in Kernan. The Court was therefore forced to decide whether the principles developed under the FELA were limited "to cases involving" those Acts. 355 U.S. at 436, 78 S.Ct. at 400. The Court rejected this limitation, finding "no difficulty in applying these principles developed under the FELA, to the present action under the Jones Act, for the latter Act expressly provides for seamen the cause of action--and consequently the entire judicially developed doctrine of liability--granted to railroad workers by the FELA." 355 U.S. at 439, 78 S.Ct. at 401 (emphasis added).
 
 
 12
 This court has observed that Kernan is "the leading case" concerning the operation of Section 53 of the FELA in a Jones Act case. Neal v. Saga Shipping Co., 407 F.2d 481, 486 (5th Cir.), cert. denied, 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969). Neal involved a longshoreman who was killed while loading cargo aboard an unseaworthy vessel. The longshoreman was found by the district court to have been 50 percent contributorily negligent. On appeal, the longshoreman's family argued essentially what the Allens argue here: that since the unseaworthiness of the vessel was caused by the violation of a safety statute, the defense of contributory negligence should not be available to the employer. 407 F.2d at 485. In considering this argument, the Neal court noted that under Section 53, if a railroad employee is injured as a result of an employer's violation of the Safety Appliances Act, "there is liability without diminution for contributory negligence." 407 F.2d at 485. The Neal court continued: "By virtue of the Jones Act, Section 53 of the FELA has been applied to violations of maritime safety statutes analogous to the Safety Appliances Act." 407 F.2d at 486. The longshoreman's contributory negligence was nonetheless a relevant factor in Neal precisely because he was a longshoreman and therefore not covered by the Jones Act. 407 F.2d at 486.
 
 
 13
 Section 53 thus did not operate in Neal because the injured employee was not a Jones Act seaman. Here there is no dispute that Captain Allen was. The Jones Act therefore applies, and both Kernan and Neal make it clear that Section 53 of the FELA is part of the Jones Act. See Kernan, 355 U.S. at 435, 78 S.Ct. at 399 (quoting Coray v. Southern Pacific Co., 335 U.S. 520, 524, 69 S.Ct. 275, 277, 93 L.Ed. 208 (1949) (referring to Section 53)).
 
 
 14
 Crook argues at some length, however, that Kernan involved only the issue of liability under Section 51 of the FELA.[2] By Crook's reading, the Supreme Court "did not so much as suggest that its holding with respect to statutory negligence was intended to apply to Secs. 53 and 54...." Crook's brief at 11. Furthermore, Crook continues, since the Neal court denied that longshoremen are covered by the Jones Act, its "discussion of Section 53 and its application to the defense of contributory negligence constituted obiter dicta." Crook's brief at 12. Crook also asserts that this "Court rejected that dicta during its disposition of Reyes v. Vantage Steamship Co., [558 F.2d 238 (5th Cir.1977), on reh'g, 609 F.2d 140 (5th Cir.1980), on appeal after remand, 672 F.2d 556 (5th Cir.1982) ], where this Court implicitly affirmed that an employer may assert a Jones Act employee's contributory negligence as a defense unless the employer's violation of a statute enacted for the safety of employees contributed to the employee's death." Crook's brief at 12 (emphasis in original).
 
 
 15
 Given the Supreme Court's discussion in Kernan of Coray, Crook's reading seems unduly parochial. But in any case, Crook's own reading of Reyes and its own reading of Section 53 make it unnecessary for us to resolve whatever differences remain between Crook and Neal since we conclude that the statute Crook violated was intended to protect Captain Allen.
 
 
 16
 Crook agrees that if any employer violates any safety statute, then the employer is liable even without a showing of negligence. However, Crook further contends that the violation of just any safety statute, though sufficient to permit a finding of liability without regard to the employer's negligence, does not necessarily bar a court from considering the employee's contributory negligence. Only where the employer violates not merely any safety statute, but rather a safety statute which was designed to protect employees, does Section 53 preclude consideration of the injured employee's contributory negligence.[3] Crook's central claim, therefore, is that not just any statutory violation will do; on the contrary, before the final sentence of Section 53 renders comparative negligence irrelevant in a Jones Act case, the court must initially determine that the statute which the employer violated is one designed to protect employees--that is, that the violated statute is analogous to either the Safety Appliances Acts or the Boiler Inspection Act.[4]
 
 
 17
 A. Purpose of 46 U.S.C. Sec. 222.
 
 
 18
 Crook acknowledges that "Section 53 of the [FELA] bars a court from considering the decedent's contributory negligence ... if [but only if] the employer has violated a statute enacted for the safety of employees." Crook's brief at 10. The sole question before us, therefore,[5] is whether 46 U.S.C. Sec. 222, the manning statute which Crook violated, was enacted for the safety of employees such as Captain Allen.
 
 
 19
 The manning statute in question, 46 U.S.C. Sec. 222, provided,[6] in part, as follows:
 
 
 20
 No vessel of the United States subject to the provisions of title 52 of the Revised Statutes or to the inspection laws of the United States shall be navigated unless she shall have in her service and on board such complement of licensed officers and crew ... as may in the judgment of the Coast Guard be necessary for her safe navigation.
 
 
 21
 The Certificate of Inspection concerning the Lady Patricia called for a crew of four. When Captain Allen drowned, she had a crew of but two. Crook admits that its usual practice, despite the requirement of the Certificate of Inspection, was to use a crew of only two on the Lady Patricia. The district court found, and Crook does not dispute, that the under-manning contributed to Captain Allen's death. Crook nonetheless continually refers to the violation of this statute as "technical non-compliance." Crook then tells us that irrespective of this "technical non-compliance" which in part caused Captain Allen's death, consideration of comparative negligence is foreclosed only if we determine initially that the purpose of the statute which Crook violated was to protect Captain Allen and others like him. Almost incredibly, Crook asserts that the manning statute reflects a concern for the safety of passengers, not crew. Crook urges us to examine Sec. 222 closely to see whether it is intended for the benefit of a ship's crew.
 
 
 22
 We have, and it is. The title to the Act of Congress which first provided for the inspection and licensing of steamboats engaged in interstate commerce did indicate, as Crook points out, that Congress intended to "provide for the better security of the lives of passengers on board vessels propelled in whole or in part by steam." 5 Stat. 304 (1838) (emphasis added). Crook suggests that the title to the 1838 Act ends our inquiry. However, the 1838 Act did not contain the predecessor to what became 46 U.S.C. Sec. 222. Rather, the manning statute at issue here was derived from an 1871 Act. That Act, which originated as Senate Bill No. 716, was entitled "An Act to Provide for the Better Security of Life on Board Vessels Propelled in Whole or in Part by Steam." 16 Stat. 446 (1871) (emphasis added). The bill was amended and discussed at some length on the House floor, but Section 14 of the Act, from which 46 U.S.C. Sec. 222 subsequently developed, was not read or discussed on the floor. Congress directed its attention in the 1871 floor debates to the general problems posed by steamships which carried both passengers and inflammable cargoes. Not surprisingly, therefore, the House debates do contain references to a concern for the safety of passengers. There are in addition, however, statements expressing a concern simply for life. See The Congressional Globe, February 16, 1871, pages 1321-1328.[7] Moreover, the 1871 Act contained in Section 8 a safety provision which required ships to carry life-preservers, axes, and the like. This safety provision did specifically refer to "passengers, officers and crew." Id. at 1324.
 
 
 23
 This relatively sparse history does not indicate that Congress intended for 46 U.S.C. Sec. 222 to benefit passengers but not crew. Furthermore, our belief that this statute aims at protecting all life, and not just passenger life, is firmly reinforced by another court's construction of the statute and also by Congress' substantial 1983 recodification of Title 46.
 
 
 24
 In Texas Co. v. National Labor Relations Board, 120 F.2d 186 (9th Cir.1941), the court briefly reviewed "the body of Congressional safety legislation for the manning, navigation and management of vessels created to protect the lives of the members of the crew." 120 F.2d at 187 (emphasis added). 46 U.S.C. Sec. 222 was among this corpus of reviewed legislation. The court pointed out that the statutory provisions which have 46 U.S.C. Sec. 222 in their lineage contain the following language in their titles: an act for the "better security of life," "better protection of life," "further protection of seamen," and "protection of such seamen." 120 F.2d at 187 & n.1. Even before the most recent recodification, therefore, it was apparent that the manning statute which Crook violated was designed at least in part for the protection of employees such as Captain Allen.
 
 
 25
 In 1983, Congress undertook thoroughly to reorganize Title 46 of the U.S.C. Congress' reason for doing so was put as follows:
 
 
 26
 Some of the oldest and most frequently amended of our maritime laws are those administered by the Coast Guard. These laws, which are referred to in this Report as maritime safety laws, are related primarily to the safety of merchant vessels. They also cover, however, the safety recreational vessels, the protection of merchant seamen, and the protection of the environment.
 
 
 27
 Many of the maritime safety laws that are related to the safety of merchant vessels and the protection of seamen were codified in 1874 in titles 52 and 53 of the Revised Statutes....
 
 
 28
 The purpose of [the recodification] is to revise, consolidate, and enact into positive law as a subtitle of title 46 of the United States Code (Shipping) the maritime safety laws administered by the United States Coast Guard. The ultimate aim of this legislation is three-fold: to make maritime safety and seamen protection law easier for the Coast Guard to administer, to make it less cumbersome for the maritime community to use, and to make it more understandable for everyone involved.
 
 
 29
 House Report (Merchant Marine and Fisheries Committee) No. 98-338, Aug. 1, 1983, reprinted in 6A U.S.Code Cong. & Admin.News 924, 925 (Oct., 1983). The comments with respect to Section 8101--the recodification of 46 U.S.C. Sec. 222--state simply that "Section 8101 provides for the required composition of the complement of licensed individuals and crew of an inspected vessel when being operated." Id. at 990. There is no indication that the provision aims solely at protecting passengers rather than crew, or that it excludes from the scope of its coverage the captains of the ships to which it extends. On the contrary, the House Reports expressly reflect a concern for the lives of crew members. See Joint Hearing of the Subcommittees on Coast Guard and Navigation, and Merchant Marine, Committee on Merchant Marine and Fisheries, April 28, 1983. Representative Young of Alaska referred to the recodification as affecting "marine safety and seamen's welfare," id. at 215, and Representative Dyson of Maryland lamented the sinking of a vessel and expressed his "grave concern for the health and safety of seamen on vessels." Id. at 216 (emphasis added); see also Congressional Record, August 1, 1983, H6066-6099, S11538-11570 (containing floor discussion of the recodification).
 
 
 30
 Our examination of the manning statute, therefore, convinces us that it was intended in substantial part to benefit employees such as Captain Allen.
 
 
 31
 B. Comparative Negligence.
 
 
 32
 Crook counters that even if we conclude that 46 U.S.C. Sec. 222 is a safety statute designed, in part, for the protection of crew, we should nevertheless affirm the district court's judgment. Crook maintains that irrespective of the statute and Crook's violation of it, this court is permitted to take account of an employee's own negligence where that negligence consists of "deliberate acts." This, of course, is directly contrary to the explicit language of Section 53 of the FELA, and to Crook's own interpretation of the application of that language in a Jones Act case. In addition, Crook never enumerates for us the deliberate acts of Captain Allen which purportedly evince his negligence.[8] Despite these deficiencies, Crook nonetheless asserts that "[w]hen a captain's deliberate acts of negligence lead to his own death, the law allows a court to consider the captain's acts of contributory (comparative) negligence, even if his own employer has failed to comply with a 'safety statute.' " Crook's brief at 21.
 
 
 33
 There is no citation of authority for this bold proposition, although Crook does suggest that the assertion is supported by Petition of New England Fish Co., 465 F.Supp. 1003 (W.D.Wash.1979). However, neither New England Fish nor Schlichter v. Port Arthur Towing Co., 288 F.2d 801 (5th Cir.), cert. denied, 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961), the other case cited by Crook, involved claims under Section 53. No party claimed in either New England Fish or Schlichter that Section 53 should bar a consideration of the employee's contributory (or comparative) negligence when the employer violates a safety statute which is designed in part for the protection of employees. Thus, Crook has not cited, and we have not located, any authority for the contention that there are exceptions to the final sentence of Section 53 of the FELA.
 
 
 34
 III. CONCLUSION.
 
 
 35
 Because we find that the manning statute is intended for the benefit of crew members, Section 53 of the FELA bars a consideration of Captain Allen's comparative negligence. Accordingly, the judgment of the district court is REVERSED, and the case is remanded to the district court with instructions to enter judgment for the Allens in the amount of $384,204. REVERSED.OPINION ON REHEARING
 
 PER CURIAM:
 
 36
 In our previously released opinion in this case, 778 F.2d 1037 (5th Cir. 1985) we reversed the district court's finding that the amount of damages to which the deceased seaman's family (the"Allens") is entitled must be reduced by 75 percent owing to the seaman's supposed contributory negligence. We held that the Allens are entitled to recover 100 percent of the damages which the trial court found them to have suffered. However, in instructing the district court to enter judgment for a specific sum, we inadvertently failed to take into account prejudgment interest as well as the future discount of those damages stemming from loss of future earnings. The district court's method of calculating the damages due the Allens had correctly accounted for these factors. Accordingly, our earlier opinion is modified insofar as it instructs that judgment be entered for a specific amount and the district court is ordered to compute the amount of damages due to the Allens using the same formula it has heretofor employed, except that Crook is liable for 100 percent of the damages (and not merely 25 percent) sustained by the Allens.
 
 
 37
 The appellee's petition for rehearing is denied, and the mandate shall issue forthwith.
 
 
 
 [1]
 Under some circumstances, not relevant here, the Certificate provided that the ship could legally operate with a crew of three
 
 
 [2]
 Section 51 provides:
 Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.
 Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.
 
 
 [3]
 The final sentence of Section 53 states:
 Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.
 
 
 [4]
 Crook seems to challenge the language in Neal as going too far. It is unnecessary for us in this case to define the reach of Neal, but we note that the Neal language quoted in the text seems to coincide precisely with Crook's position: "By virtue of the Jones Act, Section 53 of the FELA has been applied to violations of maritime safety statutes analogous to the Safety Appliances Act." 407 F.2d at 486. It is difficult to see what Crook is arguing about. However, Crook is not the only one arguing. In Bertholf v. Burlington Northern Railroad, 402 F.Supp. 171 (E.D.Wash.1975), the court rejected the Neal court's reading of Kernan and, agreeing with Crook, concluded that
 Kernan interpreted FELA broadly as imposing liability on employers without a showing of negligence where any safety statute violation by an employer contributed to the injury to the employee. However, it does not follow from this that violations of statutes other than the Safety Appliance and Boiler Inspection Acts would operate to impose absolute liability on the employer by rendering the comparative negligence provision of 45 U.S.C. Sec. 53 inoperative.
 
 
 [402]
 F.Supp. at 173
 Bertholf involved a railroad employee's suit which did not allege a violation of either the Safety Appliances Act or the Boiler Inspection Act. Apparently then, neither Crook nor the Bertholf court disputes that Section 53 does preclude consideration of comparative negligence when the employer violates a statute intended to protect employees and analogous to either the Safety Appliances or Boiler Inspection Acts. In any case, this conclusion does not seem subject to serious challenge given the language in Kernan. See also 1 B.R. Benedict Admiralty Sec. 26, at 3-157 (stating that "the result reached [in Neal] finds support in the general maritime law"). But see Heath v. Matson Navigation Co., 333 F.Supp. 131 (D.Haw.1971). Because we conclude that the statute Crook violated was intended in part to protect employees, we decline the invitation to re-examine the language in Neal.
 
 
 [5]
 The Allens have raised other issues in their brief, such as whether the district court erred in failing to allow recovery for mental anguish, and whether it erred in denying the Allens the right to a jury trial. However, counsel stated at oral argument that he would be satisfied with a reversal of the district court's finding of contributory negligence and a rendering of judgment. Accordingly, our disposition of this appeal makes consideration of the other issues raised by the Allens unnecessary
 
 
 [6]
 Section 222 of 46 U.S.C. was repealed on August 26, 1983, and was replaced by 46 U.S.C. Sec. 8101. 46 U.S.C. Sec. 8101(d) provides that: "A vessel to which this section applies may not be operated without having in its service the complement required in the certificate of inspection." The new codification is therefore substantially equivalent to the section under which this action was brought
 
 
 [7]
 In general, the House discussion reflects a conflict between sensitivity to the interests of the shipping industry--represented by both ship and cargo owners--and concern for passenger safety. This debate did not focus on the statutory provision pertinent to this appeal. See The Congressional Globe, February 16, 1871, pages 1321-1328, esp. 1323
 
 
 [8]
 Although Crook does not point to specific acts of Captain Allen, the district court found that Captain Allen was not wearing a life vest, that he failed to request additional men before returning to sea, and that he abandoned his post to help Crume even though his assistance was not needed. The final conclusion is curious insofar as the district court noted that Crume had tried for three hours to raise the anchor alone but without success. The other two conclusions are simply irrelevant under Section 53 given Crook's violation of the manning statute, a violation which, according to the district court, interfered with "the crew's capacity to retrieve the vessel's anchor and to effectuate man-overboard rescue procedures."